IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ODELL EDWARDS, Individually and | § | |
| as Representative of the Estate of | § | |
| Jordan Edwards, Deceased, | § | |
| VIDAL ALLEN and KEVON EDWARDS, | § | |
| Plaintiffs, | § | |
| | § | No. 3:17-cv-01208-M-BT |
| SHAUNKEYIA KEYON STEPHENS, | § | |
| RHONDA WASHINGTON, | § | |
| MAXWELL EVERETTE, and | § | |
| MAXIMUS EVERETTE, | § | |
| Intervenor-Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| ROY OLIVER and THE CITY OF | § | |
| BALCH SPRINGS, TEXAS, | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This civil-rights action under 42 U.S.C. § 1983 alleging excessive force in violation of the Fourth Amendment arises out of the shooting death of Jordan Edwards by former Balch Springs police officer Defendant Roy Oliver. Oliver has filed a motion for summary judgment (ECF No. 344) asserting qualified immunity and requesting the Court dismiss with prejudice all of Plaintiffs'[1] claims against him.

---

[1] The Court collectively refers to Odell Edwards, Vidal Allen, Kevon Edwards, Shaunkeyia Keyon Stephens, Maxwell Everette, Maximus Everette, and Rhonda Washington as "Plaintiffs."

Oliver's motion requires the Court to apply multiple legal standards, corresponding to summary judgment, the Fourth Amendment, and qualified immunity. At this procedural stage, summary judgment, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmovant, Plaintiffs. Excessive-force claims, like Plaintiffs', are highly fact-intensive: Whether the use of force at issue is unconstitutional depends heavily on the facts and circumstances of the particular case. And qualified immunity, a judicially-created doctrine, shields police officers from liability for excessive-force claims unless their conduct violates clearly established law. A police officer is not entitled to qualified immunity when existing legal precedent gives the officer notice that a specific use of force is excessive. Qualified-immunity cases often involve competing versions of events—this case is no exception. When the facts are disputed, the Court must use Plaintiffs' version of the facts, unless it is blatantly contradicted by the record, to evaluate whether the officer is entitled to qualified immunity.

Here, Plaintiffs contend that Oliver fired his assault rifle into a car full of teenagers as it was driving away from Oliver and his partner. Oliver promotes a different narrative, but Plaintiffs' version of the facts is not blatantly contradicted by the record, which includes video footage from the officers' body-cameras. Applying the law to Plaintiffs' version of the facts, as it must, the Court finds a reasonable jury could conclude the car full of teenagers presented no immediate threat to the officers' safety, making Oliver's use of deadly force unreasonable. Plaintiffs also have identified cases where police officers who fired at cars that did

not pose a sufficient threat of harm were held to have violated the Fourth Amendment. Therefore, based on the constitutional standard and the clearly established law, Oliver is not entitled to summary judgment on his qualified-immunity defense.

The Court takes no position concerning the outcome of this case—it only finds that the evidence before it raises a genuine issue of material fact as to whether Oliver acted unconstitutionally. Accordingly, the District Court should DENY Oliver's summary-judgment motion.

## Background

On April 29, 2017, fifteen-year-old Jordan Edwards attended a party at a house on Baron Drive in Balch Springs, Texas, with his brothers, Vidal Allen and Kevon Edwards, and two friends, Maxwell Everette and Maximus Everette. *See* Oliver Br. 13-14 (ECF No. 345); Pls.' Resp. 12 (ECF No. 371). The party was well attended by a number of other teenagers. *See* Oliver Br. 15; Pls.' Resp. 13.

At around 11:00 p.m., Balch Springs Police Department (BSPD) officers Roy Oliver and Tyler Gross arrived at the house on Baron Drive in response to a 911 call about possible underage drinking. *See* Oliver Br. 16; Pls.' Resp. 13. The partygoers quickly dispersed, and the boys returned to their car parked at the end of Baron Drive, near the intersection with Shepherd Lane. *See* Oliver Br. 16-17; Pls.' Resp. 13-14.

Then, gunfire erupted from a parking lot across Shepherd Lane. *See* Oliver Br. 19; Pls.' Resp. 14. Oliver and Gross, who had gone into the house, heard the

shots and ran outside toward the sound and the boys' car. *See* Oliver Br. 20; Pls.' Resp. 15. The boys also heard the shots. Vidal, who was behind the wheel, attempted to drive forward—west on Baron Drive—but could not do so because another vehicle blocked the road. Pls.' Resp. 14; *see* Oliver Br. 21. So he put the car in reverse and started slowly backing toward Shepherd Lane. *See* Oliver Br. 21; Pls.' Resp. 14. Gross yelled at the car to stop, but Vidal continued in reverse through the intersection, put the car in drive, and proceeded southbound on Shepherd Lane. Oliver Br. 23; Pls.' Resp. 14.

At this critical point, the parties' narratives diverge. Oliver recounts that Vidal accelerated, driving "at/by" the officers, and that Gross was "extremely close" to the boys' car when Gross struck its rear passenger window. Oliver Br. 23. Within ".358 seconds" of Gross breaking the car's window, Oliver fired his first shot. *Id.* 24. However, Plaintiffs contend that there was no immediate risk of harm to anyone when Oliver opened fire, that Oliver fired at the rear of the car as it was driving away from the officers, and after it had passed Gross. Pls.' Resp. 16.

Oliver fired five rounds, and one bullet struck Jordan in the head, killing him. Oliver Br. 25; Pls.' Resp. 17.

Vidal turned onto Bishop Drive, two blocks away from Baron Drive, and stopped the car. Pls.' Resp. 18. BSPD officers approached and ordered the boys out of the car. *Id.* 18-19. Plaintiffs contend that although Vidal, Kevon, Maxwell, and Maximus complied with the officers' orders, the officers shouted and pointed their

guns at them. *Id*. 19. BSPD officers handcuffed and detained Vidal. *Id*.; Oliver's Br. 25. The officers also detained Kevon, Maxwell, and Maximus. Pls.' Resp. 20.

Plaintiff Odell Edwards, Jordan, Vidal, and Kevon's father, together with Vidal and Kevon, who have now reached the age of majority; Intervenor-Plaintiff Shaunkeyia Stephens, Jordan and Kevon's mother; and Intervenor-Plaintiff Rhonda Washington, Maxwell and Maximus's mother, together with Maxwell and Maximus, who are also no longer minors, filed separate complaints against the City of Balch Springs and Oliver. Though Oliver filed no answer to Plaintiffs' live pleadings, he now moves for summary judgment on the basis of qualified immunity—a defense he raised in his answer to Plaintiffs' earlier complaints. Plaintiffs filed their consolidated response, and Oliver filed his reply. Pls.' Resp.; Oliver Reply (ECF No. 375).

Plaintiffs subsequently filed a motion for leave to file a surreply to respond to Oliver's objection, made in his reply, to three of Plaintiffs' exhibits included in their appendix: "(1) [T]he amended, January 17, 2018 Report of Philip Hayden ([ECF No.] 372, Ex. 12); (2) excerpts of Mr. Hayden's criminal trial testimony ([ECF No.] 372, Ex. 11); and (3) a new, November 9, 2020 expert report Mr. Hayden prepared for Plaintiffs for this case ([ECF No.] 372, Ex. 20)."[2] Mot. Leave

---

[2] On August 28, 2018, a jury found Oliver guilty of Jordan Edwards's murder and sentenced him to fifteen years' imprisonment. Pls.' App. 376 (ECF No. 372). Two years later, on August 10, 2020, the Dallas Court of Appeals affirmed his conviction and sentence. *Oliver v. State*, 2020 WL 4581644, at *19 (Tex. App.—Dallas Aug. 10, 2020, pet. granted). On January 13, 2021, the Texas Court of Criminal Appeals granted Oliver's petition for discretionary review. *See id*. at *1.

Surreply 2 (ECF No. 381). But "[u]nder Local Civil Rule 7.1, the movant is generally entitled to file the last pleading. Surreplies are highly disfavored, and this Court will only permit a surreply in exceptional or extraordinary circumstances." *Campoamor v. Cengage Learning, Inc.*, 2010 WL 11618843, at *1 (N.D. Tex. June 10, 2010) (Lynn, J.) (citation omitted). The Court does not find exceptional or extraordinary circumstances in this case to justify permitting additional briefing, particularly because the Court did not rely on those exhibits in reaching its conclusion.[3] Accordingly, Plaintiffs' motion for leave to file a surreply is DENIED, and Oliver's motion for summary judgment is fully briefed and ripe for determination.

## Legal Standards

The Court's analysis "involves multiple legal standards, corresponding to qualified immunity, summary judgment, . . . and the Fourth Amendment." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020). Because "[t]he intersection of these standards gets tricky," the Court relies on the Fifth Circuit's recent explanation of how "[q]ualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden." *Id.* at 328-29.

---

[3] Also because the Court determines Oliver is not entitled to qualified immunity at the summary-judgment stage, it does not address Plaintiffs' argument that Oliver's criminal conviction "could have collateral estoppel effect *at trial*." Pls.' Resp. 29 n.9 (emphasis added).

Foundationally, when a plaintiff cannot prove the necessary facts essential to recovery, summary judgment is proper. *See* Fed. R. Civ. P. 56. Summary judgment under the Federal Rules is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* 56(a). Summary judgment is also appropriate when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 323 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").[4] A genuine issue of material fact exists when a trier of fact could resolve

---

[4] Though Oliver sets forth "traditional" and "no evidence" summary-judgment standards, Oliver Br. 26-28, "'no evidence' motions for summary judgment are not cognizable in federal court, but proper only in Texas State court." *In re Wilshire Homes Hous., Ltd.*, 2013 WL 5162077, at *6 (S.D. Tex. Sept. 11, 2013) (citing *In re Perry*, 2009 WL 2753181, at *3 (Bankr. S.D. Tex. Aug. 26, 2009 (Bohm, J.) (stating "the 'no-evidence' standard does not apply in federal courts"); *Trautmann v. Cogema Mining, Inc.,* 2007 WL 1577652, at *2-3 (S.D. Tex. May 30, 2007); *Castenada v. Flores,* 2007 WL 1671742, at *2 (S.D. Tex. June 8, 2007) (state of Texas's "no evidence" standard does not apply in federal court)); *accord Wichy v. CVS Caremark Corp.*, 2019 WL 2745752, at *2 (W.D. Tex. May 20, 2019) (citations omitted). While Oliver does not move for summary judgment under any state-law provision, and perhaps by "no evidence" refers to the *Celotex* court's construction of Rule 56, to prevent any confusion, the Court notes the Federal Rules of Civil Procedure set forth only one summary-judgment standard under Rule 56.

the dispute in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

But the ordinary summary-judgment burden "changes with qualified immunity." *Joseph ex rel. Estate of Joseph*, 981 F.3d at 329-30 (citation omitted).

> When a public official makes "a good-faith assertion of qualified immunity," that "alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law.
>
> Once the burden is on the plaintiff, things briefly sound familiar again: The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. That would be the same if the plaintiff did not face qualified immunity. But, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to "identify a case"—usually, a "body of relevant case law"—in which "an officer acting under similar circumstances . . . was held to have violated the [Constitution]." While there need not be "a case directly on point," the unlawfulness of the challenged conduct must be "beyond debate." This leaves the "rare" possibility that, in an "obvious case," analogous case law "is not needed" because "the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances."
>
> Moving from the bar to the bench, qualified immunity similarly changes the court's normal task on summary judgment. A court decides whether summary judgment is appropriate by "view[ing] the facts in the light most favorable to the nonmoving party and draw[ing] all reasonable inferences in its favor" (so far normal), then

> determining whether the plaintiff can prove a
> constitutional violation (still normal) that was clearly
> established (not normal).

*Id.* (internal citations omitted).

Accordingly, a court reviews a motion for summary judgment based on qualified immunity in two steps. "First: 'Taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right[.]'" *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Second, [the court] ask[s] 'whether the right in question was "clearly established" at the time of the violation.'" *Id.* (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam)*; see also Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019) ("Government officials 'are entitled to qualified immunity . . . unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" (alteration in original) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (Thomas, J.))). The court may consider either step first, but "deciding the two prongs in order 'is often beneficial.'" *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### Analysis

Oliver argues he is entitled to summary judgment because qualified immunity bars Plaintiffs' claims. Oliver Br. 28. Specifically, he contends Plaintiffs have "failed to identify a constitutional right that Officer Oliver violated" and "fail

to identify clearly established law against Officer Oliver." *Id.* 29, 32. Last, Oliver asserts Plaintiff's "state law/tort claims against Officer Oliver should be dismissed" because Texas Civil Practice and Remedies Code § 101.106 requires their dismissal. *Id.* 45-47. The Court addresses Oliver's qualified-immunity arguments before considering his Texas Civil Practice and Remedies Code § 101.106 argument.

## I.

The Court first addresses whether the facts, taken in the light most favorable to Plaintiffs, show that Oliver's conduct violated Maxwell, Maximus, Vidal, Kevon, and Jordan's (collectively, the "occupant Plaintiffs") constitutional rights. *See Romero*, 888 F.3d at 176 ("First: 'Taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right[.]'" (quoting *Saucier*, 533 U.S. at 201)). Oliver argues the "Plaintiffs failed to identify a constitutional right that [he] violated." Oliver Br. 29. But Plaintiffs' complaints plainly assert Fourth Amendment excessive-force claims against Oliver.[5] Edwards Compl. 22-23, 31-32 (ECF No. 270); Washington Compl. 20-21 (ECF No. 271); Stephens Compl. 19-20, 24-25 (ECF No. 272). Taking the facts in the light most favorable to Plaintiffs, the Court finds a reasonable jury could

---

[5] Oliver has not filed an answer responding to Plaintiffs' live complaints, and his counsel admitted at a hearing on June 5, 2019, that he had not read Plaintiffs' previous complaints, Edwards 4th Am. Compl. (ECF No. 123); Stephens 3d Am. Compl. (ECF No. 134); Washington 2d Am. Compl. (ECF No. 127), which were the live pleadings at that time, though he answered those complaints. Oliver's Answers to Plaintiff's previous complaints (ECF Nos. 141, 142, 143).

conclude that Oliver's conduct violated the occupant Plaintiffs' Fourth Amendment rights.

"[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Joseph ex rel. Estate of Joseph*, 981 F.3d at 332 (citing *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012)). While "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio,* 392 U.S. 1, 22-27 (1968)), to bring an excessive-force claim, a plaintiff must establish "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)). The amount of force that is reasonable under the Fourth Amendment "is not capable of precise definition or mechanical application," and "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396 (quoting *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)); *see also Joseph ex rel. Estate of Joseph*, 981 F.3d at 332 (citing *Graham*, 490 U.S. at 396; *Poole*, 691 F.3d at 628).

Nonetheless, the Supreme Court has "outlined a few considerations that inform the need for force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Joseph ex rel. Estate of Joseph*, 981 F.3d at 332 (citing *Graham,* 490 U.S. at 396; *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). However, the Court "must assess not only the need for force, but also the relationship between the need and the amount of force used," evaluating "[t]he timing, amount, and form of a suspect's resistance," to determine whether an officer's use of force was appropriate or excessive. *Id.* at 332 (internal quotation marks omitted) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam)) (citing *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015); *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.")). Thus, while force may be justified when a suspect refuses to comply with instructions, "officers must also select the appropriate '*degree* of force.'" *Id.* (quoting *Deville*, 567 F.3d at 167-68).

Specifically, "the use of deadly force," is only reasonable when used "to protect the life of the shooting officer or others: 'Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc) (quoting *Garner*, 471 U.S. at

11). Reasonability requires that, as "a critical component of risk assessment and de-escalation," officers warn a suspect "where feasible" prior to using deadly force. *Id.* (quoting *Garner*, 471 U.S. at 11-12) (citing *Colston v. Barnhart*, 130 F.3d 96, 100 (5th Cir. 1997)). Ultimately, these considerations must be reviewed, and the reasonableness of an application of force "must be judged[,] from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" to account for "tense, uncertain, and rapidly evolving" circumstances requiring police offers to make "split-second judgments . . . about the amount of force that is necessary." *Graham*, 490 U.S. at 396-97 (citing Terry, 392 U.S. at 20-22).

Here, Oliver does not dispute whether any Plaintiff suffered an injury. *See* Oliver Br.; Oliver Reply. Instead, he argues his use of force was "objectively reasonable" and not "clearly excessive."[6] Oliver Reply 9. Specifically, Oliver contends he "instinctively/involuntarily/reasonably" shot into the occupant Plaintiffs' car because he heard "multiple/unexplained shots being fired from outside the House Party," and he observed: "the crowd of children/Party attendees reacting in chaos, running away from danger and pointing in the direction of [the occupant Plaintiffs' car]," "various semi-compliant to non-compliant vehicles departing the scene," "[Officer Gross] threatening deadly force, with his sidearm unholstered, finger on trigger, weapon pointed . . . , and ready to fire [at the

---

[6] In his brief, Oliver repeats the same paragraph five times in nearly identical format. He also separately repeats sentences from those paragraphs in other places in his brief. *See* Oliver Br. 28-29, 31-32, 34, 35. The Court reproduces the content of that paragraph here.

occupant Plaintiffs' car]," and the "non-compliant/evasive/threatening/deadly [occupant Plaintiffs' car] accelerating towards Officer Gross."[7] Oliver Br. 31-32. He also "perceived gunshot/violence from [the occupant Plaintiffs' car] towards Gross with no muzzle flash from Gross' weapon accompanied with the furtive movement" of the car's occupants. *Id.* 32.

Plaintiffs respond that Oliver's use of deadly force was unreasonable because "when he fired at the vehicle in which Jordan Edwards was a passenger, there was no longer any threat to Officer Gross or anyone else." Pls.' Resp. 28. Specifically, "Gross was behind the vehicle"—the occupant Plaintiffs' car had passed Gross by the time Oliver fired the first shot. *Id.* To determine whether Oliver's use of force was reasonable, the Court "must view the facts and draw reasonable inferences in the light most favorable to [Plaintiffs] and ask whether [Oliver] would be entitled to qualified immunity on those facts." *Cole*, 935 F.3d at 452 (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 409 (5th Cir. 2009)); *see also Joseph ex rel. Estate of Joseph*, 981 F.3d at 325 ("In qualified immunity cases, which often involve competing versions of events, we take the plaintiff's version of the facts, unless that version is

---

[7] Oliver's repeated use of the virgule throughout the presentation of his version of the facts is confusing. Among other things, the Court cannot tell whether he means the occupant Plaintiffs' car was non-compliant, evasive, threatening, and deadly; only one of those things; or some combination thereof. As discussed later in this section, a car that was merely "non-compliant" or "evasive" would likely not pose a sufficient threat to justify the use of deadly force. The Court does not dwell on this issue, however, because it must view the facts in the light most favorable to Plaintiffs.

blatantly contradicted by the record, so that no reasonable jury could believe it."
(internal quotation marks and citations omitted)).

According to Plaintiffs' version of the facts, which is not blatantly
contradicted by the officers' body-camera footage, Vidal, Kevon, Jordan, Maximus,
and Maxwell were leaving a house party that the police dispersed after an alleged
complaint about possible underage drinking. Pls.' Resp. 12-13; Pls.' App. 10, 22,
428 (ECF No. 372). Vidal was initially unable to drive away because another vehicle
blocked Baron Drive. Pls.' Resp. 14; Pls.' App. 23, 428. After Vidal heard what he
thought were gun shots, he put his car in reverse and backed slowly toward
Shepherd Lane. Pls.' Resp. 14; Pls.' App. 428; *see* Pls.' App. 23-24. As Vidal drove
slowly in reverse, he heard Officer Gross shout, "Stop!" Pls.' Resp. 14; Pls.' App. 23,
428; Def.'s App., Ex. 36 at 4:48-4:59 (ECF No. 351-6). Gross continued to yell at
the car as it crept backward into the intersection of Baron Drive and Shepherd
Lane. Pls.' Resp. 15; Def.'s App., Ex. 36 at 4:59-5:02. The car briefly paused, as
Vidal shifted gears, and then proceeded forward, southbound on Shepherd Lane,
when Gross yelled again, "Stop that fucking car!" Pls.' Resp. 15; Def.'s App., Ex. 36
at 5:02-5:05. By the time Oliver reached the stop sign at the end of Baron Drive,
the car had passed both Oliver and Gross, and Vidal began to accelerate. Pls.' Resp.
16; *see* Def.'s App., Ex. 35 at 5:18-5:22 (ECF No. 351-5) (as Oliver approaches the
stop sign, Vidal's vehicle is not visible in the intersection); *see* Def.'s App., Ex. 36
at 5:03 (as Oliver fires his first shot, the vehicle is moving away from Gross). Oliver
fired five rounds at the car as it drove away. Pls.' Resp. 16; Def.'s App., Ex. 36 at

5:02-5:05; *see* Pls.' App. 429. One of the bullets from Oliver's rifle struck Jordan in the head, killing him. Pls.' Resp. 17; *see* Pls.' App. 429, 437.

The Court examines the relevant caselaw to evaluate reasonability in this context. Previously, the Fifth Circuit found that a reasonable jury could conclude that "firing at the back of [a] vehicle from some distance . . . was not a reasonable response to any threat." *Lytle*, 560 F.3d at 417. In *Lytle*, Deputy O'Donnell began following a Taurus matching the description of a stolen vehicle and attempted to initiate a traffic stop after it changed lanes without signaling. *Id.* at 407. The Taurus accelerated, and O'Donnell chased the vehicle for a "quarter-to-half" mile, when it collided with another vehicle in the oncoming lane. *Id.*  The Taurus began backing up toward O'Donnell's cruiser, and, according to the plaintiff's version of the facts, when the Taurus was three or four houses down the block, O'Donnell fired into the rear of the Taurus, killing fifteen-year-old passenger Heather Lytle. *Id.* at 407-08. The court concluded that "a jury could determine that O'Donnell acted unreasonably in firing at the back of the Taurus and thus violated Heather Lytle's constitutional rights," because it could also determine that "by the time the Taurus was three or four houses away, . . . any immediate threat to O'Donnell had ceased." *Id.* at 413, 417. Accordingly, the court dismissed the interlocutory appeal for lack of jurisdiction because O'Donnell's entitlement to qualified immunity turned on a genuine issue of material fact—whether O'Donnell fired immediately after the Taurus backed up toward him or once it was three or four houses down the block. *Id.* at 408, 418.

Similarly, shooting the bumper of a car that is disobeying an officer's commands to stop is not objectively reasonable as a matter of law. *See Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). In *Flores*, Officer Kalina "sought to detain Erika Flores because she was parked on the wrong side of the road and because, when he shined a spotlight on the car, several people fled from the vicinity." *Id*. at 393. Flores drove away instead of responding to Kalina's "repeated commands that she stop." *Id*. Kalina shot Flores's car to prevent her escape and arrested her for evading detention. *Id*. Kalina's shot entered Flores's bumper and became lodged in the back of the muffler. *Id*. at 394. The Fifth Circuit affirmed the district court's denial of Kalina's motion for summary judgment with respect to Flores's excessive-force claim because there was a fact question as to whether Kalina's use of deadly force was objectively reasonable. *Id*. at 393, 396, 400. Specifically, the court could not find as a matter of law that "Kalina reasonably believed Flores posed any danger either to him or to anyone else" because: Kalina only "had reason to suspect . . . that Flores was guilty of a minor parking violation"; Flores "did not drive erratically," though she "pulled into the street at an angle to enter the correct lane of traffic"; and "most critically," Kalina "was already behind her car when he shot it." *Id*. at 399.

Relying on this precedent, another court in this district recently held that a vehicle slowly backing away from an officer without abruptly changing direction does not pose a sufficient threat to officers to justify the use of deadly force. *See Dawes v. City of Dallas*, 2020 WL 3603090, at *4 (N.D. Tex. July 2, 2020). In

17

*Dawes*, the plaintiffs alleged Dawes drove in reverse very slowly backing out of a parking space, with no police officer behind her, when the officers shot and killed her. *Id.* at *1, *4. The magistrate judge's recommendation specifies that the plaintiffs alleged, "[a]fter a police car drove into her path, Dawes moved her vehicle slightly forward, shifted into reverse, and slowly backed up again," when the officers "fired at least 13 shots through the passenger side window." *Dawes v. City of Dallas*, 2020 WL 5930624, at *1 (N.D. Tex. Jan. 27, 2020), *adopted in part, rejected in part*, 2020 WL 3603090 (N.D. Tex. July 2, 2020). The court found that, if the plaintiffs' allegations were taken as true, Dawes's conduct did not pose a sufficient threat to the officers because there was no need to react to an abrupt change in direction, nor did Dawes accelerate toward an officer. *Dawes*, 2020 WL 3603090, at *4 (citation omitted). Accordingly, the court denied the officer's request for a Rule 7(a) reply because the plaintiffs pleaded a facially plausible claim that the officer's use of deadly force was excessive and unreasonable for purposes of denying qualified immunity. *Dawes*, 2020 WL 5930624, at *5 (citation omitted) (recommending the court deny defendant Kimpel's motion for a Rule 7(a) reply); *Dawes*, 2020 WL 3603090, at *4 (agreeing with the magistrate judge's analysis).

But "proximity and temporal factors" are important in "cases addressing suspects fleeing in motor vehicles," as Oliver points out, and an officer's use of deadly force may be reasonable when he is in close proximity to a vehicle and has limited time to respond to it accelerating toward him. *See Hathaway v. Bazany*, 507 F.3d 312, 321-22 (5th Cir. 2007) (citations omitted); Oliver's Br. 35. In

*Hathaway*, Officer Bazany was investigating a possible gang altercation and motioned for a vehicle to pull over. *Id.* at 315-16. Once the vehicle did so, he approached the driver's side. *Id.* at 316. When he was eight to ten feet from the vehicle, it began accelerating toward him. *Id.* When he realized he was not going to be able to get out of its path, he decided to fire his weapon. *Id.* The vehicle struck him on his left leg, but Bazany did not know "whether he drew and fired before, during, or immediately after he was struck by the [vehicle]." *Id.* The Fifth Circuit found that Officer Bazany's use of deadly force was reasonable because of the brief time period he had to respond to the serious threat of the vehicle accelerating toward him and did not fire "after the perception of new information indicating the threat was past." *Id.* at 322. Accordingly, the court found Officer Bazany did not violate Jon-Eric Hathaway's constitutional rights and affirmed summary judgment in Bazany's favor. *Id.* at 322-23.

Likewise, a vehicle accelerating toward an officer standing feet away constitutes a sufficient threat of harm making an officer's use of deadly force reasonable. *See Sanchez v. Edwards*, 433 F. App'x 272, 275-76 (5th Cir. 2011) (per curiam). In *Sanchez*, Officer Banquer and Deputy Schwebel were surveilling a residence when Sanchez pulled into a neighboring driveway. *Id.* at 273. The officers approached Sanchez's vehicle and ordered him to stop, but Sanchez reversed into the street. *Id.* Once out of the driveway, Sanchez put the car into drive and accelerated in Banquer's direction. *Id.* Both officers fired their service weapons; the vehicle struck Banquer; and three shots hit Sanchez, killing him. *Id.* at 274. The

Fifth Circuit had "absolutely no trouble finding that the officers['] decision to use deadly force was reasonable under the circumstances" because of the "short period of time in which [they] had to react to Sanchez's abrupt change of direction and Banquer's obvious peril given his position in front of the vehicle." *Id*. at 275. Accordingly, the court affirmed the district court's grant of summary judgment for the officers. *Id*. at 273, 276.

And, of course, an officer is entitled to summary judgment where the record could only enable a reasonable jury to find that, under the totality of the circumstances, a plaintiff posed a threat of serious harm to the officer's physical safety at the time he fired his weapon. *Wright v. City of Garland*, 2014 WL 5878940, at *10 (N.D. Tex. Nov. 13, 2014) (Fitzwater, J.). In *Wright*, Officer Stallings was inside an apartment complex searching for two individuals who had fled the investigation scene when he heard Wright's horn honking and thought Wright might be the two individuals' ride. *Id*. at *1. Stallings approached Wright's car on foot, shined his flashlight at it, and "within seconds," Wright accelerated. *Id*. Wright contended he accelerated toward the complex's exit, but Stallings asserted Wright accelerated toward him. *Id*. Officer Stallings reacted by firing five shots within a two-second interval at Wright's vehicle—two shots entered the open passenger window and struck Wright. *Id*. The court held Officer Stallings was entitled to summary judgment on qualified immunity because Wright, the nonmovant, "failed to produce evidence that would enable a reasonable jury to find that Officer Stallings did not have reason to believe that Wright posed a threat of

serious harm to Officer Stallings' physical safety at the time he fired his weapon at Wright's vehicle." *Id.* at *8, *11.

"As these decisions indicate, a suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable." *Lytle.*, 560 F.3d at 416. The analysis is more "nuanced," *Dawes*, 2020 WL 5930624, at *4, such that "[i]n cases involving a moving vehicle, the objective reasonableness of a decision to use deadly force depends on whether the vehicle posed a threat of harm in the particular circumstances faced by the officer." *Id.* (citing *Lytle*, 560 F.3d at 412).

In this case, according to the facts taken in the light most favorable to Plaintiffs—again, facts that are not blatantly contradicted by the evidence in the summary-judgment record, neither Oliver nor Gross was positioned in front of the occupant Plaintiffs' car when Oliver opened fire. Rather, Oliver and Gross were positioned behind and to the side of the car as it passed them. Oliver and Gross's position and the timing of Oliver's shots after the car started moving away from Gross make this case more like *Lytle* and *Flores* and less like *Hathaway* and *Sanchez* in terms of the threat the car posed to Gross. And unlike *Wright*, the body-camera footage sufficiently raises a fact question that could enable a reasonable jury to conclude that Plaintiffs' vehicle did not pose a sufficient threat of harm to Gross because it was moving away, making Oliver's use of deadly force unreasonable. Accordingly, Plaintiffs have met their burden to show that a fact question exists as to whether Oliver violated Vidal, Kevon, Jordan, Maximus, and

Maxwell's Fourth Amendment rights, and the Court turns to whether those rights were clearly established at the time of the incident. *See Lytle*, 560 F.3d at 417 ("We therefore conclude that a jury *could* determine that O'Donnell acted unreasonably . . . and thus violated Heather Lytle's constitutional rights. This is sufficient to affirmatively answer the constitutional violation question of our inquiry. We thus turn to the question of whether those rights were clearly established at the time of the incident." (emphasis added)).

## II.

Second, the Court must address whether the unlawfulness of Oliver's conduct, on Plaintiffs' version of the facts, was clearly established—that is, whether on April 29, 2017, the date of the shooting, any reasonable officer would have known that Oliver's conduct was unlawful. *See Joseph ex rel. Estate of Joseph*, 981 F.3d at 336 (citing *Saucier*, 533 U.S. at 199). Oliver contends "it was not clearly established on the night of the Incident that his use of force violated the 4th Amendment," Oliver Br. 44, and that Plaintiffs "have failed to identify any case law with substantially similar facts in which the Court found the Defendant Officer was not entitled to Qualified Immunity." Oliver Reply 10. Plaintiffs respond that Oliver's use of deadly force violated the occupant Plaintiffs' clearly established rights. Pls.' Resp. 33. The Court finds that Plaintiffs have met their burden to show that, taking the facts in the light most favorable to them, the unlawfulness of Oliver's conduct was clearly established as of the date of the shooting.

A right is clearly established when "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks and citation omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent," and "prohibit the officer's conduct in the particular circumstances before him." *Id.* at 589-90. Generally, this "requires the plaintiff to 'identify a case'—usually, a 'body of relevant case law'—in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'" *Joseph ex rel. Estate of Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590). And "[w]hile there need not be 'a case directly on point,' the unlawfulness of the challenged conduct must be 'beyond debate.'" *Id.* (quoting *Wesby*, 138 S. Ct. at 590). Essentially, "[t]he central concept is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Lytle*, 560 F.3d at 417 (internal quotation marks omitted) (quoting *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004) (en banc)).

Plaintiffs cite *Lytle*, among other cases, as authority indicating that the Fifth Circuit held in 2009 that an officer acting under similar circumstances acted unconstitutionally. Pls.' Resp. 32-33. Indeed, several years before April 29, 2017, the Fifth Circuit held that "[i]t has long been clearly established that . . . it is unreasonable for a police officer to use deadly force against a fleeing felon who

does not pose a sufficient threat of harm to the officer or others" and that "[t]his holds as both a general matter and in the more specific context of shooting a suspect fleeing in a motor vehicle." *Lytle*, 560 F.3d at 417-18 (citations omitted); *accord Dawes*, 2020 WL 3603090, at *3; *see also Flores*, 381 F.3d at 400 (affirming the district court's denial of summary judgment as to the plaintiff's excessive-force claim because the court could not resolve whether the officer's conduct was clearly established "without reference to disputed questions of material fact"). In fact, the *Lytle* court stated that the right was clearly established as of "February 28, 2006." *Lytle*, 560 F.3d at 418. In its previous discussion of whether Oliver's conduct violated the occupant Plaintiffs' constitutional rights, the Court determined that this case is more factually similar to *Lytle* and *Flores* and less similar to *Hathaway* and *Sanchez* because Oliver and Gross were behind the occupant Plaintiffs' car when Oliver fired five shots, according to the facts taken in the light most favorable to Plaintiffs. Thus, because the Fifth Circuit has already determined that it is unreasonable to use deadly force against a suspect fleeing in a motor vehicle who does not pose a sufficient threat to an officer or others, the Court finds that were a jury to credit Plaintiffs' version of the facts, it could conclude Oliver violated the occupant Plaintiffs' clearly established right to be free from an unreasonable seizure on April 29, 2017.

The Court finds that Plaintiffs have met their burden to show that, taking the facts in the light most favorable to them, the unlawfulness of Oliver's conduct was clearly established as of the date of the shooting. "For [the Court] to say that

the unlawfulness of such conduct wasn't clearly established in 2017, despite the fact that [*Lytle*] said it was clearly established in [2009, or even in 2006], would flout precedent . . . ." *See Joseph ex rel. Estate of Joseph*, 981 F.3d at 342 (citation omitted). Accordingly, the Court finds that Oliver is not entitled to qualified immunity at this stage of the proceedings. *See Lytle*, 560 F.3d at 411 (quoting *Abraham v. Raso,* 183 F.3d 279, 290 (3d Cir. 1999)) ("[R]easonableness under the Fourth Amendment should frequently remain a question for the jury. To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared.").

## III.

Last, Oliver asserts the Court should dismiss Plaintiffs' "Wrongful Death and Survival Claims against Oliver," which are "based in Tort," because "Texas's 'Election of Remedies' statute" precludes Plaintiffs "from pursuing a claim against any Balch Springs employee (including Officer Oliver) [and the City of Balch Springs] regarding the same subject matter." Oliver Br. 45-46 (citing Tex. Civ. Prac. & Rem. Code § 101.106(a)). Plaintiffs respond that they do not seek to hold Oliver liable under any state-law tort theory; rather, "[t]he unlawful seizure claim is based on 42 U.S.C. § 1983[,] and the bystander claim is not a state law claim but simply an element of damage to the Plaintiffs who were in the vehicle and

witnessed the fatal shooting of their brother, Jordan."[8] Pls.' Resp. 35. The Court finds Oliver is not entitled to summary judgment on Plaintiff Odell Edwards and Shaunkeyia Stephens's § 1983 wrongful-death claims or Odell Edwards's survival claim under Texas Civil Practice and Remedies Code § 101.106.

"The Fifth Circuit has held that section 1983 incorporates state wrongful death and survival statutes 'to provide . . . full remedies for violations of constitutional rights.'" *Mata v. City of Ennis*, 2003 WL 252027, at *3 (N.D. Tex. Jan. 30, 2003) (Lynn, J.) (alteration in original) (quoting *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 390 (5th Cir. 1992)); *see also Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 208-09 (5th Cir. 2016) (citations omitted) ("Federal civil-rights laws extend federal-question jurisdiction, however, by incorporating state wrongful-death statutes. Thus, an individual may bring a claim under federal civil-rights laws through Texas's wrongful-death statute."); *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) (citing 42 U.S.C. § 1988(a); *Rhyne*, 973 F.2d at 390-91; *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961)) ("Standing under the Civil Rights Statutes is guided by 42 U.S.C. § 1988, which provides that state common law is used to fill the gaps in administration of civil rights suits. Therefore, a party must have standing under the state wrongful death or survival statutes to bring a

---

[8] As the Court has previously noted, Plaintiffs' complaints do not assert "bystander" claims; rather, Vidal, Kevon, Maximus, and Maxwell—the Plaintiffs "who were in the vehicle and witnessed the fatal shooting of their brother, Jordan"—assert § 1983 claims for their own psychological injuries. Edwards Compl. 31-32; Washington Compl. 20-21. Therefore, the Court only addresses those claims.

claim under 42 U.S.C. §§ 1981, 1983, and 1988."). Accordingly, "a parent may recover damages analogous to state law wrongful death damages in a § 1983 action based on the violation of her child's civil rights." *Flores v. Cameron Cnty.*, 92 F.3d 258, 271 (5th Cir. 1996) (citing *Rhyne*, 973 F.2d at 391). For example, "in *Grandstaff* [*v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)]*,* the Texas wrongful-death statute allowed a father to assert § 1983 claims based on his son's wrongful death." *Rodgers*, 819 F.3d at 209 (citing *Grandstaff*, 767 F.2d at 167, 172). Courts must look to state wrongful-death and survival statutes to determine which parties have standing to bring wrongful-death and survival claims under § 1983; in this case, the Texas wrongful-death and survival statues, Texas Civil Practice and Remedies Code §§ 71.004 and 71.021, "set forth the parties who can bring suit." *Aguillard v. McGowen*, 207 F.3d 226, 231 (5th Cir. 2000); *accord May v. City of Arlington*, 2018 WL 1569888, at *9 (N.D. Tex. Mar. 30, 2018).

Here, Plaintiffs Odell Edwards and Shaunkeyia Stephens bring § 1983 wrongful-death claims as Jordan Edwards's parents. Edwards Compl. 1, 31; Stephens Compl. 1, 24-25. And Odell Edwards brings a § 1983 survival claim on behalf of Jordan Edwards's estate. Edwards Compl. 1, 31. That is, they assert they are entitled to Texas's wrongful-death and survival remedies as a result of their § 1983 claims. While state-law "is used to fill the gaps in administration of civil rights suits," thus providing for damages and determining the parties who have standing to bring wrongful-death and survival claims, Plaintiffs bring wrongful-death and survival claims under § 1983—not state law. *See Pluet*, 355 F.3d at 383

(citing 42 U.S.C. § 1988(a)); *Saenz v. City of El Paso*, 2015 WL 4590232, at *7 (W.D. Tex. Jan. 28, 2015) ("Plaintiff did not bring a cause of action pursuant to the Texas Wrongful Death Statute, but rather pursuant to § 1983, which *incorporates* Texas's wrongful death remedy through § 1988."), *aff'd sub nom. Saenz v. Flores*, 668 F. App'x 611, 611 (5th Cir. 2016). And Oliver "cites no case law suggesting that § 1988 also incorporates state law immunity granted by the Texas Tort Claims Act." *Saenz*, 2015 WL 4590232, at *7. In fact, § 1988's text makes clear that its purpose is to incorporate additional state-law remedies when federal statutes insufficiently protect and vindicate civil rights, rather than reduce available remedies. *Id.* ("Section 1988 thus focuses on the incorporation of additional civil rights *remedies* under the common law and says nothing of state law immunity against such remedies.").[9] Accordingly, Plaintiffs' § 1983 wrongful-death and survival claims are not subject to or barred by the Texas Tort Claims Act at Texas Civil Practice and Remedies Code § 101.106, and Oliver is not entitled to summary judgment on

---

[9] "The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty." 42 U.S.C. § 1988(a).

Plaintiffs' § 1983 wrongful-death and survival claims on that ground. *See Saenz*, 2015 WL 4590232, at *7; *Estate of Sorrells v. City of Dallas*, 45 F. App'x 325, 2002 WL 1899592, at *4 (5th Cir. July 10, 2002) (per curiam) (citations omitted) (stating that the Sorrells family's claims against Dallas were not claims under the TTCA because "Dallas was only sued under § 1983"); *Wright v. City of Garland*, 2014 WL 1492356, at *3 (N.D. Tex. Apr. 16, 2014) (Fitzwater, J.) (citing *Estate of Sorrells,* 2002 WL 1899592, at *4) (finding defendant police officer was not entitled to dismissal of plaintiff's § 1983 claim against him under Tex. Civ. Prac. & Rem. Code § 101.106(f) or § 101.106(a) because "[t]hese are provisions of the TTCA, which does not apply to [plaintiff's] § 1983 claim.").

## Recommendation

For the reasons stated, the District Court should DENY Defendant Roy Oliver's motion for summary judgment (ECF No. 344).

**SO RECOMMENDED.**

January 19, 2021.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

The United States District Clerk is directed to serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 14 days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation will bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the findings, conclusions, and recommendation within 14 days after being served with a copy will bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).