IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ODELL EDWARDS, Individually and | § | |
| as Representative of the Estate of | § | |
| Jordan Edwards, Deceased, | § | |
| Plaintiff, | § | |
| | § | No. 3:17-cv-01208-M-BT |
| v. | § | |
| | § | |
| ROY OLIVER and THE CITY OF | § | |
| BALCH SPRINGS, TEXAS, | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This § 1983 civil-rights action arises out of the 2017 shooting death of Jordan

Edwards by former Balch Springs police officer Defendant Roy Oliver. At an earlier

point in this litigation, the Court found that Plaintiffs alleged sufficient facts—

which the Court was required to accept as true—to state viable claims against

Defendant the City of Balch Springs based on the City's allegedly unconstitutional

use-of-deadly-force policy and failure-to-train and failure-to-supervise or -

discipline theories of liability, and allowed those claims to move forward to this

procedural stage where evidence may be tested.[1] Now, in the context of the City's

---

[1] Several important developments have occurred since that point. Defendant Oliver
filed a summary-judgment motion on his qualified-immunity defense, which the
Court denied, *see* Order (ECF No. 314), and Oliver appealed that decision to the
Fifth Circuit. Thereafter, Plaintiffs Vidal Allen and Kevon Edwards and Intervenor
Plaintiffs Shaunkeyia Stephens, Maxwell Everette, and Maximus Everette settled
all their claims against Oliver and the City. *See* Joint Submission (ECF No. 459);
Am. Joint Submission (ECF No. 460); *see also* Stipulation of Dismissal (ECF Nos.

Motion for Summary Judgment (ECF No. 396), the Court considers the City's arguments that Plaintiff Odell Edwards cannot show the City is liable for Jordan's death.

A city may be liable under 42 U.S.C. § 1983 if the city deprives a person of his or her constitutional rights—such as the right to be free from excessive force—or causes a person to be subjected to such a deprivation. But a city is responsible only for its own illegal acts. It is not vicariously liable under § 1983 for its employees' actions. A city is not liable merely because it employs a wrongdoer. Indeed, a city is not liable under § 1983 unless a constitutional violation resulted from an official city policy. And proving that an official policy actually caused a constitutional violation often presents difficult problems of proof.

The law recognizes that an official policy may be a formal, written policy or one that is merely informally practiced. For a city to be liable, however, the formal, written policy must be unconstitutional as written or the informal practice must be so widespread, as evidenced by numerous similar instances, that a city would have to be aware of the practice and deliberately indifferent to its constitutional deficiency.

---

461, 462, 463); Order Approving Settlement (ECF No. 464). However, Plaintiff Odell Edwards, individually, and in his purported capacity as representative of his son Jordan's estate, did not settle any of his claims against either Defendant. *See* Am. Joint Submission 1 nn. 3-4. Accordingly, the Court must consider the City's summary-judgment motion as to Edwards's remaining claims against it.

After examining the evidence in the summary-judgment record, the Court finds (1) that the City's formal, written policy applicable to the circumstances in this case is not unconstitutional as written and not the moving force behind Oliver's conduct that resulted in Jordan's death, and (2) that Edwards has not provided evidence of similar instances in sufficient number to create a fact question as to whether the City was deliberately indifferent to the alleged constitutionally-deficient training and supervision of its police officers. Therefore, the Court concludes the City's summary-judgment motion should be GRANTED and recommends that Edwards's claims against the City be DISMISSED with prejudice.

## Background[2]

In its summary-judgment brief, the City includes a paragraph entitled "Uncontested Facts." City's Br. 21 (ECF No. 398). Edwards affirms that "[a]lthough the City's recitation of 'uncontested facts' certainly downplays the horrific events giving rise to this lawsuit, rehashing those facts here is neither necessary nor material to the City's motion, which expressly 'is directed toward the municipal

---

[2] The Court assumes the parties' familiarity with the prior opinions in this case. *See generally Edwards v. Oliver*, 2020 WL 4073764 (N.D. Tex. July 2, 2020), *rec. adopted*, 2020 WL 4057540 (N.D. Tex. July 20, 2020) (denying City's Rule 12(b)(6) motions to dismiss); *Edwards v. Oliver*, 2021 WL 881283 (N.D. Tex. Jan. 19, 2021), *rec. adopted*, 2021 WL 873190 (N.D. Tex. Mar. 9, 2021) (denying Oliver's summary-judgment motion on qualified immunity)). Accordingly, the Court limits its discussion of the background facts and procedural history to the information necessary to understand these findings, conclusions, and recommendation.

liability claims asserted as to the City[.]'" Pls.' Am. Resp. 8-9 (ECF No. 433).

Edwards notes "[t]o the extent those facts need to be revisited, [he] . . .

incorporate[s] by reference . . . the Magistrate Judge's Findings, Conclusions, and

Recommendation" (FCR) on Defendant Oliver's motion for summary judgment.

*Id.* at 9 n.1 (citing FCR (ECF No. 390)). Accordingly, for the purpose of providing

background information, the Court reproduces the facts set forth in its prior FCR.

> On April 29, 2017, fifteen-year-old Jordan Edwards attended a party at a house on Baron Drive in Balch Springs, Texas, with his brothers, Vidal Allen and Kevon Edwards, and two friends, Maxwell Everette and Maximus Everette. The party was well attended by a number of other teenagers.

> At around 11:00 p.m., Balch Springs Police Department (BSPD) officers Roy Oliver and Tyler Gross arrived at the house on Baron Drive in response to a 911 call about possible underage drinking. The partygoers quickly dispersed, and the boys returned to their car parked at the end of Baron Drive, near the intersection with Shepherd Lane.

> Then, gunfire erupted from a parking lot across Shepherd Lane. Oliver and Gross, who had gone into the house, heard the shots and ran outside toward the sound and the boys' car. The boys also heard the shots. Vidal, who was behind the wheel, attempted to drive forward—west on Baron Drive—but could not do so because another vehicle blocked the road. So he put the car in reverse and started slowly backing toward Shepherd Lane. Gross yelled at the car to stop, but Vidal continued in reverse through the intersection, put the car in drive, and proceeded southbound on Shepherd Lane.

> At this critical point, the parties' narratives diverge. Oliver recounts that Vidal accelerated, driving "at/by" the officers, and that Gross was "extremely close" to the boys' car when Gross struck its rear passenger window. Within ".358 seconds" of Gross breaking the car's window, Oliver fired his first shot. However, [Edwards] contend[s] that there was no immediate risk of harm to anyone when Oliver opened fire, that Oliver fired at the rear of the car as it was driving away from the officers, and after it had passed.

4

Oliver fired five rounds, and one bullet struck Jordan in the head, killing him.

FCR 3-4 (ECF No. 390) (internal citations omitted).[3]

The City concludes its "Uncontested Facts" paragraph by stating "Oliver was hired as a police officer in 2011 and was terminated three days after the incident." City's Br. 21. Edwards adds that the City hired Oliver in 2011 "despite distinct psychological warning signs," including his answers on a psychological-screening test that prompted the evaluating psychologist to note: (i) "the possibility that [Oliver] may have some trouble generating good solutions in problem-solving situations;" and (ii) Oliver "may feel so insensitive to threat that his judgment may be impaired in evaluating the risk of danger." Pls.' Am. Resp. 9-10. Also, the psychologist noted Oliver's "sense of entitlement may be so strong that the possibility of his behaving in an antisocial manner must be considered." *Id.* at 10. Edwards contends the City should not have hired Oliver knowing these psychological red flags, but having hired him, the City should have been aware of "a need for training, supervision, and—when called for—discipline." *Id.* at 10.

Edwards further adds that "Oliver lived up to the unpredictable, poor problem-solving reputation his psychological screening predicted," and the City

---

[3] The FCR also notes that, on August 28, 2018, a Dallas County jury found Oliver guilty of Jordan's murder and sentenced Oliver to fifteen years' imprisonment. FCR 5 n.1. The Dallas Court of Appeals affirmed Oliver's conviction and sentence. *Oliver v. State*, 2020 WL 4581644, at *19 (Tex. App.—Dallas Aug. 10, 2020, pet. granted). The Texas Court of Criminal Appeals granted Oliver's petition for discretionary review on a single issue. *See id.* at *1.

failed to adequately discipline him or require him to undergo any additional training or counseling to curtail his behavior. *Id.* at 10-11. Among other things, Edwards asserts that, in 2013, Oliver "used excessive force against Luis Medina, Jr." when Oliver "slammed" Medina to "the ground while Medina was experiencing an epileptic[-]seizure episode." *Id.* at 12. And two weeks before Oliver killed Jordan in April 2017, Oliver angrily confronted a woman brandishing his gun after she rear-ended him in his personal vehicle when he was off duty. *Id.*

Edwards contends other Balch Springs police officers had a similar history of violent and aggressive conduct. *Id.* at 13. In 2013, Sergeant James Young shot an unarmed black man in a car. In 2014, Young assaulted an inmate. *Id.* And in 2014 and 2016, two different Balch Springs police officers tasered individuals who were not resisting. *Id.* In the 2014 incident, the arrestee who was tasered died. *Id.* The City never disciplined the officers involved in these incidents. *Id.*

Based on these facts, Edwards asserts municipal-liability claims under § 1983 for violating Jordan's Fourth Amendment rights, alleging that the City, through its official policymakers, promulgated an unconstitutional written use-of-force policy and failed to properly train, supervise, or discipline its officers, including those known to have engaged in excessive, deadly force. *Id.* at 15-28. Edwards further contends that the City's policies were the "moving forces" behind his constitutional injuries, and, therefore, the City itself is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.*

The City moves for summary judgment on Edwards's theories of municipal liability: an express unconstitutional use-of-force policy; failure to train; and failure to supervise or discipline (which the City addresses as part of an "implied policy" theory).[4] City's Br. 10-20. Succinctly stated, the City asserts the record does not support the existence of a practice or custom involving deliberate indifference of a final policy maker, which caused the shooting that resulted in Jordan's death. More specifically, the City argues: (i) its deadly-force policy is not facially unconstitutional; (ii) the other incidents Edwards relies on to prove the City had a practice and custom of using excessive, deadly force in situations where it was not justified do not meet the requirements of numerosity, similarity, and specificity; (iii) there is no evidence of deliberate indifference attributable to the City's

---

[4] The City also moves for summary judgment on Edwards's ratification and "hiring" or failure-to-screen theories of liability. But as the Court mentioned in its previous FCR on the City's motion to dismiss, Edwards does "not assert a failure-to-screen claim against the City . . . based on an unconstitutional official, or unofficial, hiring policy, and the Supreme Court has rejected utilizing the single-incident exception in the inadequate-screening context." FCR 25 n.96 (ECF No. 311) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410-11 (1997) ("The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." (emphasis in original))). In response, Edwards clarifies that any "hiring theory" is not a "stand-alone claim." Pls.' Am. Resp. 24. "Rather," Edwards explains, "the hiring of Oliver and the aggressive tendencies [the] psychological evaluation revealed simply inform the need for training, supervision, and discipline." *Id*. at 24-25. Nor does Edwards assert a ratification theory of municipal liability. *See id*. at 8 ("Other than the ratification theory that Plaintiffs concede is not supported by this record, the City's other arguments are without merit . . . ."). Accordingly, the Court does not consider either failure-to-screen or ratification theories of liability.

policymaking officials; and (iv) the record does not support Edwards's failure-to-train and failure-to-supervise or -discipline theories. Edwards responds that the evidence in this case establishes a genuine issue of material fact regarding his municipal-liability claims against the City and, therefore, summary judgment is improper. The City's motion is fully briefed and ripe for determination. City's Mot. (ECF Nos. 396, 397, 398); Pls.' Am. Resp. (ECF Nos. 433, 434); City's Reply (ECF No. 440).

The Court finds the City is entitled to summary judgment on all of Edwards's claims. The Court first addresses Edwards's claims arising out of the City's allegedly unconstitutional official use-of-force policy before turning to the failure-to-train and failure-to-supervise or -discipline claims.

### Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue for trial. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citation omitted). The movant's burden can be satisfied by demonstrating that there is an absence of evidence to support the nonmoving party's case, which the nonmovant bears the burden of proving at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its initial burden, the nonmovant must show that summary judgment is not proper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992) (citing *Celotex Corp.*, 477

U.S. at 323-24). The parties may satisfy their respective burdens "by tendering depositions, affidavits, and other competent evidence." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (citing Fed. R. Civ. P. 56(e); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)). The party opposing the summary-judgment motion must identify specific evidence in the record and state the precise manner in which that evidence supports the party's claim. *Esquivel v. McCarthy*, 2016 WL 6093327, at *2 (N.D. Tex. Oct. 18, 2016) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1988)). "Rule 56 does not impose a duty on the court to 'sift through the record in search of evidence' to support the nonmovant's opposition to the motion for summary judgment." *Id.* (quoting *Ragas*, 136 F.3d at 458 (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992))). All evidence must be viewed in the light most favorable to the party opposing the summary-judgment motion. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993) (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986)).

## Analysis

"A person may sue a municipality that violates his or her constitutional rights 'under color of any statute, ordinance, regulation, custom, or usage.'" *Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021) (quoting § 1983; citing *Monell*, 436 U.S. at 690). To establish municipal liability under § 1983, "a plaintiff must show the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy." *Hutcheson*, 994 F.3d at 482

(internal quotation marks omitted) (quoting *Valle v. City of Hous.*, 613 F.3d 536, 541 (5th Cir. 2010)). "A plaintiff must identify '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom).'" *Hutcheson*, 994 F.3d at 482 (quoting *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002)). "Municipalities are not liable 'on the theory of respondeat superior' and are 'almost never liable for an isolated unconstitutional act on the part of an employee.'" *Hutcheson*, 994 F.3d at 482 (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)); *see also Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019).

A. Official Use-of-Force Policy

The City argues its official use-of-force policy at the time of the shooting is constitutional because it "require[d] that deadly force involving a vehicle be applied *only* in response to an *immediate* threat" and that Edwards's complaints "cherry-picked *excerpts* of that directive" to improperly portray otherwise. City's Br. 22 (emphasis in original). Edwards responds that "[t]he City's use[-]of[-]force policy, as stated, is unconstitutional on its face because it directly contradicts what the United States Supreme Court has determined are the constitutional limits on the use of deadly force—allowing the use of force when there is no immediate threat and allowing the particular officer to use deadly force when he or she 'reasonably believes' it is necessary, not when such use of force is 'objectively reasonable.'" Pls.' Am. Resp. 17. The Court finds that the City's use-of-deadly-force policy applicable

to the circumstances in this case is constitutional, and the use-of-deadly-force policy was not the moving force of Oliver's conduct.

The Court evaluates the reasonableness of police procedures on the use of force under the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 15-16 (1985); *see also Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)). "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978); *Terry*, 392 U.S. at 21). And "[t]he calculus of reasonableness" must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

"To gauge the *objective* reasonableness of the force used by a law enforcement officer," a court "must balance the amount of force used against the need for force, paying careful attention to the facts and circumstances of each particular case." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (emphasis

added) (internal quotation marks omitted) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)). Specifically, the Fourth Amendment's case-specific balancing exercise involves considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest." *Hill v. Carroll Cty.*, 587 F.3d 230, 234 (5th Cir. 2009) (internal quotation marks omitted) (quoting *Graham,* 490 U.S. at 396). But "the use of deadly force is permitted only to protect the life of the shooting officer or others: 'Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (quoting *Garner*, 471 U.S. at 11). A municipality's use-of-force policy must adhere to the foregoing Fourth Amendment jurisprudence. And "[w]here an official policy or practice is unconstitutional on its face," a plaintiff need not establish deliberate indifference because "it necessarily follows that a policymaker was not only aware of the specific policy but was also aware that a constitutional violation was most likely to occur." *Hobart v. City of Stafford*, 2015 WL 1637876, at *13 (S.D. Tex. Apr. 13, 2015) (citing *Burge,* 336 F.3d at 370; *Boyd v. City of Hous.*, 548 F. App'x 100, 103 (5th Cir. 2013) (per curiam); *Piotrowski*, 237 F.3d at 579-80)); *see also Hobart*, 2015 WL 1637876, at *14 ("If a plaintiff is able to demonstrate that a municipality promulgated a policy that was unconstitutional on its face, he or she does not also need to prove that the policy was promulgated with knowing disregard for its consequences—knowledge is presumed.").

Here, the City's use-of-force policy reads as follows:



**BALCH SPRINGS, TEXAS POLICE DEPARTMENT**
**GENERAL ORDERS MANUAL**

2. In evaluating the reasonable application of force, officers may consider their own age, size, strength, and skill level with department weapons, state of health, and the number of officers opposing the number of suspects.

**IV. PROCEDURES**

    A. <u>Use of Non-deadly Force</u>

        1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable and necessary to bring an incident under control. (TBP: 6.01)

        2. Force may be used by a police officer in the performance of his duties to achieve a lawful objective as set forth in Chapter 9 of the Texas Penal Code.

        3. Acknowledged levels of resistance:

            a. Psychological intimidation -- such as subject body stance (boxing, karate, etc.)
            b. Verbal non-compliance - abusive language, cursing, verbal refusal to comply with officer's direction.
            c. Passive resistance - sit in demonstration, hands tucked underneath the body.
            d. Defensive action - turning, jerking, or twisting away.
            e. Active aggression - hitting, kicking, biting, etc.
            f. Aggravated active aggression - aggressive resistance with a weapon, and/or uses techniques or objects which could result in death or serious bodily injury to the confronting officer.



**BALCH SPRINGS, TEXAS POLICE DEPARTMENT**
**GENERAL ORDERS MANUAL**



B. Use of Deadly Force

   Law enforcement officers are authorized to use deadly force when one or both of the following apply:

   To protect the officer or others from what is reasonably believed to be a threat of death or serious bodily injury. (TBP: 6.02)

C. Deadly Force Restrictions

   1. Warning shots shall not be fired. (TBP: 6.09)

   2. Firearms shall not be discharged at a moving vehicle in an attempt to disable the vehicle.

   3. Because of the low probability of penetrating a vehicle with a handgun, officers threatened by an oncoming vehicle should attempt to move out of its path, if possible, instead of discharging a firearm at it or any of its occupants. However, if an officer reasonably believes that a person is immediately threatening the officer or another person with deadly force by means of a vehicle, an officer may use deadly force against the driver of the vehicle.

14



**BALCH SPRINGS, TEXAS POLICE DEPARTMENT
GENERAL ORDERS MANUAL**

4. Firing a firearm or use of deadly force in situations where the use of deadly force would not be in accordance with Chapter 9 of the Texas Penal Code.

5. Use of deadly force or firing firearms without first-hand knowledge of crime events in an alleged offense. Officers are not to rely solely on third person reports as basis for use of deadly force.

6. Firing into buildings or other places where offenders are suspected of hiding. The only exception to this will be where there is no doubt of offender's location and when deadly force or intended deadly force is being directed from that location at the officer or others.

7. Officers may use deadly force to destroy an animal that represents a threat to public safety or as a humanitarian measure where the animal is seriously injured, when the officer reasonably believes that deadly force can be used without harm to the officer or others. In these circumstances, a supervisor shall be contacted prior to the use of deadly force if time permits.

City's App. 56-58 (ECF No. 397-1). Edwards asserts the City's use-of-force policy is unconstitutional because it permits the use of deadly force when there is no immediate threat and when an officer subjectively believes it is necessary—the same arguments Edwards made at the motion-to-dismiss stage. Pls.' Am. Resp. 17. But the Court previously determined "the City's use-of-force policy does not unconstitutionally permit officers to consider subjective criteria in evaluating reasonable force." FCR 24 (ECF No. 311). And, though Edwards successfully pleaded "the [City's] use-of-force policy is unconstitutional because it authorizes officers to use deadly force . . . without instructing [them] that the threat must be immediate," *id.* at 19, now that the City's complete, written use-of-force policy is

before the Court in the summary-judgment record, the Court finds the policy applicable to the circumstances in this case—the third "Deadly[-]Force Restriction," which concerns using deadly force against vehicular threats—is constitutional.

In a different procedural context, that of Oliver's summary-judgment motion on his qualified-immunity defense, the Court found the record evidence presented by Oliver, Edwards, and other plaintiffs sufficiently raised a fact question that could enable a reasonable jury to conclude that the boys' car did not pose a sufficient threat of harm to justify Oliver's use of force because the car was moving away. Using Plaintiffs' version of the facts, which were not "blatantly contradicted" by the other evidence, the Court concluded a jury could find that "there was no longer any threat to Officer Gross or anyone else [when Oliver fired at the boys' car]. . . . [The boys'] car had passed Gross by the time Oliver fired the first shot." *Edwards*, 2021 WL 881283, at *6. (internal citations omitted).

For purposes of the City's motion, however, the "uncontested facts" are that Oliver and Officer Gross encountered a car full of teenagers leaving a party. Officer Gross yelled for the car to stop and, as it drove past Oliver, Oliver filed multiple rounds into the car killing Jordan, who was sitting in the car's front passenger seat. City's Br. 21 (describing the "Uncontested Facts"); *see also* Pls.' Am. Resp. 8-9 ("Although the City's recitation of 'uncontested facts' certainly downplays the horrific events giving rise to this lawsuit, rehashing those facts here is neither necessary *nor material*." (emphasis added)).

The third Deadly-Force Restriction governs the facts in this case. *See* City's App. 57 (ECF No. 397-1). It instructs "officers threatened by an oncoming vehicle . . . to move out of its path, if possible, instead of discharging a firearm at it or any of its occupants." *Id.* But it authorizes an officer who "reasonably believes that a person is *immediately* threatening the officer or another person with deadly force by means of a vehicle" to "use deadly force against the driver of the vehicle." *Id.* (emphasis added). Accordingly, the City's use-of-force policy governing these circumstances does not permit officers to use deadly force without an immediate threat.

Edwards's argument fails to the extent Edwards argues this specific Deadly-Force Restriction permits a "particular officer to use deadly force when he or she 'reasonably believes' it is necessary, not when such use of force is 'objectively reasonable.'" Pls.' Am. Resp. 17. Because, under a policy using such language, "[t]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation," *Graham*, 490 U.S. at 397 (citations omitted). Courts have not found the "reasonably believes" qualifier to unconstitutionally inject subjective considerations into the objectively reasonable standard. *See Aragon ex rel. Aragon v. City of San Antonio* 2015 WL 13793384, at *3 (W.D. Tex. Nov. 30, 2015) (finding the following deadly-force policy constitutional: "The use of deadly force is authorized only to protect an officer or another person from what is reasonably believed to be an immediate threat of death or serious bodily

injury."), *adopted sub nom. Est. of Aragon v. City of San Antonio*, 2015 WL 13793385 (W.D. Tex. Dec. 18, 2015); *Salazar-Limon v. City of Houston*, 97 F. Supp. 3d 898, 909 (S.D. Tex. 2015) (Rosenthal, J.) ("The clearly established law at the time of the shooting held that an officer's reasonable belief that a suspect poses an immediate threat, even if that belief turns out to be incorrect, justifies the use of deadly force." (citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379 (5th Cir. 2009); *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991); *Loch v. City of Litchfield*, 689 F.3d 961 (8th Cir. 2012) (Colloton, J.))), *aff'd*, 826 F.3d 272 (5th Cir. 2016); *Ontiveros v. City of Rosenberg*, 2008 WL 11423907, at \*5 (S.D. Tex. Feb. 1, 2008) ("Where an officer reasonably believes that a suspect poses an immediate threat to himself or others, the use of deadly force does not violate the Fourth Amendment." (citations omitted)), *aff'd,* 564 F.3d 379 (5th Cir. 2009); *Ybarra v. City of Chi.*, 946 F.3d 975, 978 (7th Cir. 2020) ("When an officer reasonably believes an assailant's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." (citation omitted)).

Nonetheless, Edwards argues that the third Deadly-Force Restriction does not control because it "does not state the City's overall 'use of deadly force' policy," and "[t]he policy *authorizing* the use of force is not at all constrained by immediacy." Pls.' Am. Resp. 18. But the City's policy authorizing deadly force is constrained by the enumerated restrictions—ignoring them in favor of the "authorizing policy" would effectively read the restrictions out of the City's policy.

Moreover, the third Deadly-Force Restriction is "constrained by immediacy," as its second sentence permits deadly force against the driver of a vehicle only when "an officer reasonably believes that a person is immediately threatening the officer or another person with deadly force by means of a vehicle." City's App. 57. Thus, as written, the City's official deadly-force policy does not permit shooting into a vehicle without an immediate threat.

Edwards further argues that the third Deadly-Force Restriction does not control because it only "provides a narrow exception . . . for encounters with oncoming vehicles," and "[a]bsent an 'oncoming vehicle,'" the City's "overriding 'use of deadly force' authorization" applies. Pls.' Am. Resp. 18-19. Edwards contends that the Court must proceed as if there was no oncoming vehicle here, because "[t]here is . . . a fact question, as this Court has already determined in its Findings, Conclusions, and Recommendations [sic] related to Oliver's motion for summary judgment, with regard to whether the vehicle was traveling toward [or away from] Oliver," and taking the facts in the light most favorable to Edwards, the boys' car was traveling away from Oliver when he shot at it. Pls.' Am. Resp. 18-19. While the third Deadly-Force Restriction's text authorizing the use of deadly force when "an officer reasonably believes that a person is immediately threatening the officer or another person with deadly force by means of a vehicle" is not per se limited to "encounters with oncoming vehicles," City's App. 57, it requires some imagination to conceive of a circumstance wherein "deadly force by means of a vehicle" would not involve an "oncoming" vehicle. The policy does not define

"oncoming" or provide any guidance on the use of force when a vehicle changes direction. But if the third Deadly-Force Restriction does not apply because the boys' car was traveling away from Oliver and Gross when Oliver fired at it, the City's "overriding 'use of deadly force' authorization" still does not control. Indeed, the second Deadly-Force Restriction more specifically addresses this case's circumstances and provides, "Firearms shall not be discharged at a moving vehicle in an attempt to disable the vehicle." Thus, even if the third Deadly-Force Restriction does not apply to the specific factual circumstances in this case, it is the second Deadly-Force Restriction that applies rather than the City's "overriding 'use of deadly force' authorization." *Id.*

In connection with their argument asserting a fact question exists regarding whether the boys' car was "oncoming," Edwards also cites *Hobart v. City of Stafford,* 2015 WL 1637876, at *13 (S.D. Tex. April 13, 2015), and includes a parenthetical stating that the *Hobart* court found a "fact question[ ] related to whether a municipal policy on deadly force is facially unconstitutional." Pls.' Am. Resp. 18 n.4. To the extent Edwards asserts that there is a fact question as to whether the City's official, written policy is facially unconstitutional, that is a question of law for the Court to decide. *See Crook v. Galaviz*, 2015 WL 502305, at *5 (W.D. Tex. Feb. 5, 2015) ("[T]he constitutionality of [a] policy under the Equal Protection Clause is a pure question of law." (internal quotation marks and citation omitted)), *aff'd,* 616 F. App'x 747 (5th Cir. 2015); *Hum. Rts. Def. Ctr. v. Baxter Cty. Arkansas*, 999 F.3d 1160, 1164 (8th Cir. 2021) ("These so-called *Turner* factors

present factual and legal questions for which 'the district court must necessarily find the facts that either support or undermine the constitutionality of a particular [policy], [but] the ultimate conclusion as to constitutionality is a question of law.'" (quoting *Hill v. Blackwell*, 774 F.2d 338, 343 (8th Cir. 1985))); *United States v. Cespedes*, 151 F.3d 1329, 1331 (11th Cir. 1998) ("The constitutionality of a statute is a question of law subject to *de novo* review." (citation omitted)).

In *Hobart*, the court concluded, "there [was] a fact question as to whether the City [of Stafford's] policy on the use of deadly force is facially unconstitutional." 2015 WL 1637876, at *13. Specifically, the *Hobart* court determined a reasonable jury could find "the City [of Stafford's] . . . policy . . . encouraged its officers to use deadly force in situations where a reasonable officer would not believe him or herself or the public to be at risk of harm" based on two officers' testimony and, therefore, "found a genuine issue of material fact as to whether the encouragement of the excessive use of force was a persistent widespread practice that was so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* (internal quotation marks and citation omitted). But the issue before the Court is whether the City's official, written use-of-force policy is constitutional as it relates to the circumstances in this case—not whether the City has an unconstitutional "persistent widespread [use-of-force] practice that was so common and well settled as to constitute a custom that fairly represents municipal policy." Accordingly, the court's finding in *Hobart* of a fact question as to whether the City of Stafford's use-of-deadly-force policy was facially unconstitutional is

inapposite here. The Court finds as a matter of law that the City's official, written use-of-force policy applicable to the circumstances in this case is constitutional.

Finally, Edwards argues the City's official, written deadly-force policy is unconstitutional because "even the City's Police Chief acknowledged that the policy's definition of 'objectively reasonable' incorporated a *subjective* belief on the part of each individual officer," and "according to Plaintiffs' expert, Philip Hayden, the policy was too vague to be of much use to the officers, and made it foreseeable a grave injury or harm could be the result." Pls.' Am. Resp. 19 n.5. While the appendix citations Edwards includes in making this argument purport to cite portions of Chief Haber's and Philip Hayden's depositions, they all lead to portions of Chief Haber's deposition and do not appear relevant to the arguments Edwards makes. *See id.* Nonetheless, as stated, determining whether the text of an official, written policy is constitutional is a question of law, and "[q]uestions of law are the sole province of the court, not of expert witness testimony . . . ." *Stallion Heavy Haulers, LP v. Lincoln Gen. Ins. Co.*, 2011 WL 130154, at *2 (W.D. Tex. Jan. 13, 2011); *see also Owen v. Kerr-McGee Corp.,* 698 F.2d 236, 240 (5th Cir. 1983) ("[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant"). Nor would Chief Haber's understanding of the policy alter its constitutionality as officially written— rather, it could only indicate the existence of an unofficial use-of-force policy, which is a separate inquiry not before the Court or alleged in Edwards's complaints apart from their failure-to-train or failure-to-supervise or -discipline claims.

Therefore, the Court finds that the City's official, written use-of-force policy applicable to the circumstances in this case is constitutional.

"For a facially constitutional policy, the test of causation is whether the policy was the 'moving force' of a constitutional violation." *Cole v. Hunter*, 497 F. Supp. 3d 172, 185 (N.D. Tex. 2020) (citation omitted); *see also Lewis v. Pugh*, 289 F. App'x 767, 775 (5th Cir. 2008) ("To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it." (quoting *Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992)). But here, Edwards does not point to any evidence to raise a fact issue as to whether Oliver fired at the boys' car because the City's official use-of-force policy dictated that conduct. Thus, there is no evidence to show that the City—as opposed to Oliver—acted culpably. Edwards has failed to raise a genuine fact issue to support his claim that the City's facially-constitutional, official, written use-of-force policy was the "moving force" behind any constitutional deprivation. No reasonable jury could conclude that the City is liable for Oliver's use of force based on its official use-of-force policy. Accordingly, the City is entitled to summary judgment on Edwards's claim predicated on its official use-of-force policy.

B. Failure to Train, Supervise, or Discipline

As the Court previously noted, though Edwards asserts separate claims for failure-to-train and failure-to-supervise or -discipline, "the elements required to prove a claim under either theory are the same." *Jean v. City of Dallas*, 2019 WL

7195308, at *5 n.6 (N.D. Tex. Aug. 12, 2019) (citing *E.G. v. Bond*, 2017 WL 129019, at *3 (N.D. Tex. Jan. 13, 2017)), *adopted by* 2019 WL 7187104 (N.D. Tex. Dec. 23, 2019). The Court, therefore, considers them together.

The City argues Edwards's failure-to-train and failure-to-supervise or -discipline claims fail because "the incidents on which [Edwards relies] do not meet the requirements of *numerosity, similarity and specificity*." The City further asserts that Edwards's failure-to-train claim fails because it does not "address any alleged shortcoming in either the specific training program, the training provided to Oliver[,] or the State training requirements with which BSPD complied." City's Br. 20. Edwards responds that the City's "training failures manifested themselves in other, similar incidents sufficient to demonstrate deliberate indifference on the part of the City" and that its "failure to take disciplinary action in response to an improper use of force . . . support[s] an inference that there was a preexisting de facto policy of allowing officers to use illegal force." Pls.' Am. Resp. 21, 23-24. The Court finds Edwards has failed to raise a fact question as to whether the City was deliberately indifferent with respect to both claims.

"A failure-to-train action is a type of *Monell* claim" for municipal liability. *Hutcheson*, 994 F.3d at 482. "The 'failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement.'" *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009)). To establish a failure-to-train or a failure-to-supervise or -discipline claim, a plaintiff

must "prove that (1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Id.* (quoting *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018)). "A pattern of similar constitutional violations by untrained [or unsupervised] employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train [or supervise]." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (Thomas, J.) (quoting *Bryan Cnty. Comm'rs v. Brown,* 520 U.S. 397, 409 (1997)); *see also Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 n.34 (5th Cir. 2005) ("Claims of inadequate supervision and claims of inadequate training both generally require that the plaintiff demonstrate a pattern." (citations omitted)). A pattern is "ordinarily" rather than always necessary because "in certain extreme circumstances, a single act by a municipal employee [may] form the basis of municipal liability apart from a pattern of unconstitutional activity," where "a plaintiff . . . prove[s] that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train [or supervise] represented the 'moving force' behind the constitutional violation." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005); *see also Brown v. Bryan Cnty.*, 219 F.3d 450, 462 (5th Cir. 2000) (concluding that a single decision constituted "deliberate indifference" where there was "*no* training (and *no* supervision)" of the subordinate). But "[t]he

'single incident exception' is extremely narrow," *Valle v. City of Hous.*, 613 F.3d 536, 549 (5th Cir. 2002), and "is generally reserved for those cases in which the government actor was provided no training whatsoever." *Pena*, 879 F.3d at 624. And, as the Court previously stated, Edwards "do[es] not plead the single-incident exception as a theory of liability in [his] amended complaint[]." FCR 26 n.99 (ECF No. 311). Thus, that theory is not before the Court.

Here, with respect to the third element of a failure-to-train claim, Edwards argues the City's deliberate indifference is demonstrated by "'several examples demonstrating the City . . . failed to train . . . Oliver, and other City policy [sic] officers in their core tasks and also failed to provide them with appropriate remedial force training.'" Pls.' Am. Resp. 22-23. Specifically, Edwards's expert Dr. John Peters cites "Oliver's alleged slamming to the ground Luis Median, Jr. who was experiencing an epileptic seizure," "the fatal shooting of an unarmed male by Sergeant James Young in 2013," and "Sergeant Young's assault on an inmate because the inmate verbally disrespected him," as examples of failures to train. Dr, Peters further states that "[b]ased upon [his] education, training, and experience, these training failures by the City . . . demonstrate [its] deliberate failure to provide remedial training on these force issues." Pls.' App. 278 (ECF No. 434). Additionally, Edwards points to City Police Chief Jonathan Haber's deposition wherein he responded "yes," when asked, "I think you indicated that prior to the Jordan Edwards's [sic] incident there were at least two shootings that involved shooting at moving vehicles?" Pls.' App. 67, at 251:13-16, 18.

But to prove a pattern showing the City was deliberately indifferent to a particular training failure, the incidents must be similar. *See Est. of Davis ex rel. McCully*, 406 F.3d at 383 ("While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired . . . ."). The only incident Peters identifies involving conduct similar to Oliver's shooting into the boys' car is Sergeant Young's 2013 shooting, though Edwards does not provide any more detail about that incident than he did at the motion-to-dismiss stage. And Chief Haber's affirmative answer that two previous shooting-at-moving-vehicle incidents occurred provides no detail indicating whether those incidents are similar enough to contribute to a pattern of training failures or even whether Chief Haber counted the 2013 Sergeant Young incident among those two. *See Valle*, 613 F.3d at 548 (requiring "[s]ome greater level of detail about these prior shootings" because "[a]lthough it is possible to infer that these prior shootings may have involved the use of excessive force, that inference is too tenuous to survive summary judgment").

In essence, then, Edwards points to only one similar incident—Sergeant Young's 2013 shooting. Though "[n]either the Fifth Circuit nor the Supreme Court has specifically stated how many prior incidents are required to show a pattern," *Garcia v. City of Lubbock*, 487 F. Supp. 3d 555, 572 (N.D. Tex. 2020), the Court finds that evidence of a single incident four years before the incident giving rise to this lawsuit is insufficient to demonstrate a pattern to support the inference that the City was deliberately indifferent to constitutionally deficient training of its

27

police officers. *See Peterson*, 588 F.3d at 851 ("A pattern also requires sufficiently numerous prior incidents, as opposed to 'isolated instances." (internal quotation marks and citation omitted)). Because Edwards has failed to raise a fact question as to deliberate indifference, the Court need not address the other two elements of his failure-to-train claim.

Edwards additionally argues that "the City provided no training, leaving it to each individual officer to figure out for him or herself what the vague and confusing policy meant," Pls.' Am. Resp. 22. In support, Edwards cites Peters's deposition wherein he states "all the training documents that [he] received . . . only focused on a previous policy and never this one," and "there's no proof there's ever been instruction on this [written use-of-force] policy." Pls.' App. 172, at 46:14-17, 23-24. Peters further opines in his report that "Oliver's training records fail to show he was trained in defensive tactics per policy." Pls.' App. 276. While Peters's testimony primarily goes to the first element of a failure-to-train claim, "whether the city failed to train the officers involved," rather than the third element, deliberate indifference, the Fifth Circuit has stated that the single-incident exception to proving deliberate indifference "is generally reserved for those cases in which the government actor was provided no training whatsoever." *Pena*, 879 F.3d 613, 624. Edwards has not pleaded the single-incident exception as a theory of liability in his amended complaint, and so that theory is not properly before the Court. But even if it was, Edwards has not demonstrated that Oliver received no training, as is required to prove the City was deliberately indifferent based on this

single incident. In fact, Edwards's assertion that the City provided "no training" and his characterization of Peters's testimony as indicating as much are disingenuous—because Peters testified that the Balch Springs Police Department "met the standards [regarding training for firearms and defensive tactics] as far as the minimum standards went. But an agency had—and an employer has an obligation to keep people proficient. . . . Because all the standards are minimum standards. The employer can go beyond those and should." Pls.' App. 174, at 55:20-25; 56:1-10. Accordingly, Edwards "cannot avail [himself] of th[e single-incident] exception [to show deliberate indifference] because [he cannot prove] that there was 'no training whatsoever.'" *Hutcheson*, 994 F.3d at 483 (quoting *Pena*, 879 F.3d at 624); *Connick*, 563 U.S. at 68 ("But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. '[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice." (citation omitted)). Because Edwards has not raised a fact question as to whether the City was deliberately indifferent with respect to Edwards's failure-to-train claim, the District Court should grant summary judgment in the City's favor on that claim.

Edwards similarly fails to demonstrate a pattern supporting the inference that the City was deliberately indifferent to constitutionally deficient supervision of its police officers. With respect to his failure-to-supervise or -discipline claim, Edwards asserts Peters's testimony is "once again instructive and probative." Pls.'

Am. Resp. 24. Peters opines that the City's "lack of procedures and/or implementation [regarding supervision and discipline] appears to be calculated to institutionalize the lack of accountability for use of force incidents" and that the City's "actions and inactions show an organizational culture that clearly is biased toward protecting BSPD police officers . . . even if . . . officers demonstrated outrageous behavior." Pls.' App. 279-80. Peters cites "examples of . . . Oliver's deviant behavior that confirms [sic] this policy," including "the deliberate ignoring of . . . Oliver's Facebook page posting that read, 'will never in my life be as good at anything else as I am at killing people,'" "his unprofessional and aggressive behavior during a court proceeding that prompted the Dallas County District Attorney's Officer [sic] to file a complaint in 2013," and Lieutenant Maret requiring Luis Medina to come to the police station to file a complaint about how Oliver treated Medina's son in 2014. Pls.' App. 280-81. Edwards also points to a 2017 incident in which Oliver pulled out his firearm and pointed it at a woman who "rear-ended him in a minor traffic accident." Pls.' App. 135.

Edwards's expert Dr. Philip Hayden stated "[n]o administrative action was taken, and it does not appear that the chief was made aware." *Id*. But "[t]o show deliberate indifference, a plaintiff normally must [prove] a 'pattern of similar constitutional violations by [unsupervised] employees.'" *Hutcheson*, 994 F.3d at 482 (quoting *Pena*, 879 F.3d at 623); *see also Jones v. King*, 2014 WL 4964310, at *1 (S.D. Miss. Oct. 3, 2014) ("In order to establish deliberate indifference in a Section 1983 action for failure to supervise, a plaintiff must demonstrate a pattern

of violations and that the inadequacy of supervision is obvious and likely to result in a constitutional violation." (citing *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009))). None of the instances Edwards offers in support of his failure-to-supervise or -discipline claim are similar enough to demonstrate a pattern. For "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Est. of Davis ex rel. McCully*, 406 F.3d at 383; *accord Livezey v. The City of Malakoff*, 657 F. App'x 274, 277-78 (5th Cir. 2016) ("We have held that failing to respond to a history of 'bad or unwise acts' that 'demonstrate lack of judgment, crudity, and, perhaps illegalities' is not enough for deliberate indifference."). Accordingly, Edwards has failed to raise a fact question as to whether the City was deliberately indifferent to constitutionally deficient supervision of its officers. Because no fact question exists as to the third element, deliberate indifference, the Court need not address the other two elements of Edwards's failure-to-supervise or -discipline claim.

In his response brief, Edwards states that "no one with the BSPD was ever seriously reprimanded for any use-of-force incident until Oliver was fired for killing Jordan Edwards," without any citation or support. Pls.' Am. Resp. 24. Edwards also references the City's expert Danny Defenbaugh's discussion of changes that have been or should be made to the City's policy. Pls.' Am. Resp. 25 (citing City's App. 28 (ECF No. 397-2)). But Defenbaugh's recommendations regarding the City's policy do not refer to any instances that could evidence a pattern demonstrating the City's deliberate indifference to remedy Edwards's

31

deficient proof on that element. And establishing municipal liability requires more than identifying changes that could have been made to the City's policy. *City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989) ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under [section] 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a [section] 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."). Accordingly, Edwards has not raised a fact question as to whether the City was deliberately indifferent with respect to his failure-to-supervise or -discipline claim, and the District Court should grant summary judgment in the City's favor on that claim as well.

## Recommendation

For the reasons stated, the District Court should GRANT the City's Motion for Summary Judgment (ECF No. 396) and DISMISS with prejudice Plaintiff Edwards's claims against it.

**SO RECOMMENDED.**

November 24, 2021.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

32

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk is directed to serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 14 days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation will bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the findings, conclusions, and recommendation within 14 days after being served with a copy will bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).