IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ODELL EDWARDS, Individually and as | § | |
| Representative of the Estate of JORDAN | § | |
| EDWARDS, DECEASED, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:17-CV-1208-M |
| | § | |
| ROY OLIVER | § | |
| Defendants. | § | |

### ~~PROPOSED~~ JOINT PRETRIAL ORDER

Plaintiff Odell Edwards, Individually and on behalf of the Estate of Jordan Edwards, and former City of Balch Springs Police Officer Defendant Roy Oliver submit this Joint Pretrial Order pursuant to Local Rule 16.4 and this Court's July 22, 2022 Trial Scheduling Order (Doc. 494).

### I.    Summary of Claims and Defenses of Each Party

**A.    Plaintiff Odell Edwards, individually and on behalf of the Estate of Jordan Edwards.**

This is an action brought by the Plaintiff against former City of Balch Springs Police Officer Roy Oliver, in his individual capacity, for his use of excessive, deadly force under color of law resulting in the death of Jordan Edwards in violation of Jordan's individual rights under the Fourth Amendment of the United States Constitution and in violation of his civil rights pursuant to 42 U.S.C. § 1983. Odell Edwards, who is Jordan Edwards's biological father and an heir of the Estate of Jordan Edwards, brings this claim on behalf of the Estate because Jordan died without a will, there is no administration of Jordan Edwards' Estate pending and none is necessary as there are no debts of the Estate.

Plaintiff contends that he is entitled to recover damages for the Estate as well as a statutory wrongful death beneficiary as a result of Oliver's conduct.

On April 29, 2017, at approximately 9:30 p.m., Jordan Edwards attended a party at a private residence located in Balch Springs, Texas with his two brothers, Vidal and Kevon, and a couple of his friends, twin brothers Maxwell Everett and Maximus Everett (the "Everett Twins"). (PX 1 at 4:25-5:23, Vidal Allen Interview).[1] Vidal drove his father's vehicle to the party and, once there, parked on Baron Drive near the end of the street. (PX 1 at 7:20-8:17, Vidal Allen Interview); PX 2, Kevon Edwards Interview at 24:3-15); PX 6, Maximus Everett Interview at 10:19-25).[2] The party was hosted at a private residence at 12304 Baron Drive and was attended by other teenagers.  (PX 6, Maximus Everett Interview at 4:9-10).

Given the number of teenagers attending the party and the noise associated with the party, a neighbor allegedly called police, worried about possible underage drinking. (PX 9, Tyler Gross Depo. at 143:5-13; PX 10, Oliver Criminal Test. at 116:23-24).[3] At or around 11:00 p.m., the boys were in the backyard and saw lights from police cars and heard sirens, and decided to leave through a gate in the backyard.  (PX 1, Vidal Allen

---

[1] References to any exhibits in Plaintiff's statement of claims are to the exhibits that were included in the Appendix (Doc. 372) filed in support of Plaintiff's response to Oliver's motion for summary and may not necessarily correspond to the exhibits listed on Plaintiff's exhibit list being filed in conjunction with the filing of this document.

[2] At some point during the evening, Vidal drove Jordan and a friend to a nearby gas station to get some snacks.  When Vidal returned to the party, he parked in the same spot.  (PX 1, Vidal Allen Interview at 13:14-15:17, 16:15-23).

[3] Officer Gross would later confirm that they did not observe any alcoholic beverages at the party.  (PX 9, Tyler Gross Depo. at 152:8-10).

Interview at 17:1-18:5); (PX 2, Kevon Edwards Interview at 23:2-20). The crowd of minors began to quickly disperse. (PX 2, Kevon Edwards Interview at 25:25-26:8). Since they were already outside, Vidal, Kevon, and a friend of theirs decided to avoid the crowd inside of the home and instead jumped over a fence where they were able to get to their vehicle that was still parked on Baron Drive. (PX 2, Kevon Edwards Interview at 24:1-25:7). Vidal and Kevon met Jordan and the Everett Twins at the vehicle, and they all proceeded to leave. (*Id.*).

Initially, Vidal was unable to drive off because a pick-up truck was blocking Baron Drive. (PX 1, Vidal Allen Interview at 18:9-13). The scene turned somewhat chaotic as the boys heard what they thought to be gun shots. (PX 1, Vidal Allen Interview at 17:25-18:7; PX 2, Kevon Edwards Interview at 26:18-27:3). Not knowing what had just transpired or who fired the shots and unable to drive forward, Vidal placed his vehicle in reverse and slowly backed towards Shepherd Lane, away from the area where he initially thought the shooting came from. (PX 1, Vidal Allen Interview at 18:12-19:4). As Vidal continued driving slowly in reverse, he heard someone with a bright light pointed at the windshield of his car shout "Stop the fucking car!" but could not readily identify who the person was because the light blinded him. (*Id.*; PX 18, Vidal Allen Aff. at 2, ¶ 5). Once Vidal made it to the intersection of Baron Drive and Shepherd Lane, he stopped the vehicle and then proceeded forward, southbound on Shepherd Lane. (PX 1, Vidal Allen Interview at 18:12-19:4; PX 18, Vidal Allen Aff. at 2, ¶ 5).

The two officers who arrived at the party were Tyler Gross and Roy Oliver. According to the call they received, there was concern about the possibility of underage

drinking.  (PX 9, Tyler Gross Depo. at 143:5-13; PX 10, Oliver Criminal Test. at 116:23-24).

Gross would later confirm that no alcohol was observed at the party.  (PX 9, Tyler Gross

Depo. at 152:8-10).

When Gross and Oliver arrived at the party, they turned their body cameras on.

That video captured their entire interaction with the kids at the party and, ultimately, the

shooting.[4]

Gross and Oliver were inside the home at 12304 Baron Drive when they heard

shots fired.  (DX 35 at 4:11; DX 36 at 4:29).  Both officers immediately left the residence

and Gross proceeded east on Baron Drive.  (DX 35 at 4:15-4:28).

As he walked east down the sidewalk, Gross entered the street.  (DX 35 at 4:28-

4:32).  Gross ordered a car to stop that was backing up near him.  (DX 35 at 4:32-4:36).  At

this point, Gross was walking east down the middle of Baron Drive.  (DX 35 at 4:36-4:44).

Vidal's car can be seen near the end of the street, but a considerable distance from Gross.

(*Id*).  Gross appears to order the vehicle to stop as it is reversing toward Shepherd Lane,

but then is heard reading the license number of the vehicle to someone.  (DX 35 at 4:48-

4:56).  By the time Gross yells at the car again, it is in the middle of Shepherd Lane and

stopping to proceed forward on Shepherd Lane.  (DX 35 at 4:56-4:58).  As the car proceeds

forward, Gross yells at the car again, but it is clear from the video that Gross is still not

---

[4] Those videos are referenced herein as "DX 35" and "DX 36," which are the bodycam videos of Oliver and Gross, respectively.  These references correspond to the designations given these exhibits in the Appendix filed in support of Oliver's motion for summary judgment. (Doc. 351-5, 351-6)

close to the vehicle and certainly not in the path of the vehicle as it begins to move forward. (DX 35 at 4:58-5:03).

At the same time Gross proceeded on foot down Baron Drive, Oliver proceeded west on Baron Drive to where his squad car was parked to retrieve his semi-automatic rifle. (DX 36 at 4:34-4:54). After retrieving his rifle, Oliver walked slowly back down Baron Drive to where it intersects with Shepherd Lane. (DX 36 at 4:54-5:13). Neither Vidal's car nor Gross are visible on Oliver's body cam video. (*Id.*).

At some point, Oliver begins to jog toward the end of the street. (DX 36 at 5:13-5:21). As he reaches the stop sign at the end of Baron Drive, Vidal's vehicle is not only past Officer Gross, but it is also past Oliver (DX 35 at 5:04-06; DX 36 at 5:21-5:23). As the car is driving away, Oliver fires five shots from his assault rifle at the vehicle. (DX 35 at 5:04-06); DX 36 at 5:21-5:23). As Philip Hayden, a prosecution expert at Oliver's criminal trial described the scene:

> When Officer Gross reached the subject vehicle, he is near the back wheel and Officer Oliver has now positioned himself just behind the front passenger side wheel in line with the front window. From this position, he is close to Officer Gross and should have no problem seeing the position of the vehicle in relation to Officer Gross. Before he reached the subject vehicle, he begins to raise his weapon, indicating his intent to shoot even though he nor Officer Gross are near the subject vehicle. Seconds before he begins to raise his rifle, the vehicle is slowly backing away from Officer Gross. When he reached his shooting position, it is my opinion, which I hold to a reasonable degree of professional certainty, the [Oliver] has made the decision to shoot even though the vehicle is now traveling south on Shepherd Lane and is not in a position to run over any person.

(PX 12 at 9, Hayden Report—1/17/18; PX 11 at 200:16-203:25, Hayden Trial Testimony; PX 20 at 11, Hayden Report—11/9/20). Grant Fredericks, the forensic video expert at

Oliver's criminal trial, also concluded that Officer Gross was positioned behind the vehicle when each shot was fired.   (DX 46 at 4, Fredericks Report).   The Plaintiffs' designated expert, Dr. John Peters, was of a similar opinion, concluding that:

> ... at no time was the vehicle a threat to Officer Oliver or any other person. Vidal Allen can be clearly observed driving in an opposite direction from Officers Oliver and Gross via their body-worn cameras.   Therefore, there was no need to use any force, including deadly force, toward the occupants of the vehicle.

(PX 14 at 20-21, Dr. Peters' Report).

The bullets fired by Oliver entered the car, causing Jordan, Vidal, and Kevon to fear for their lives.[5]   (PX 18 at ¶ 7, Vidal Allen Aff.; PX 19 at ¶ 7, Kevon Edwards Aff.). One of the bullets struck Jordan in the head moments after he told the passengers in the car to duck.   (DX 24, Autopsy Report; PX 10 at 188:1-9, Oliver Criminal Test.).   The force of the shot was so great it caused Jordan to be thrown to his left side where he landed on the shoulder of Vidal.   (PX 18 at ¶ 6, Vidal Allen Aff.).

After the shots were fired, Oliver asked Gross if he was alright, and then proclaimed to Gross, "He was trying to hit you."   (DX 35 at 5:08-5:10; DX 36 at 5:24-5:28). Gross did not answer Oliver.   (DX 35 at 5:10-5:14; DX 36 at 5:28-5:32).   However, Gross testified that he was never in fear of the vehicle, did not think that the vehicle was trying to hit him and testified consistent with what the video shows:   that when Oliver shot at the vehicle it was driving away from Oliver.   (PX 9 at 247:14-19, 258:15-20, 262:4-14, 263:18-24, Tyler Gross Depo.).   Other eyewitnesses, Jeremy Seaton and Eric Knight, who

---

[5] One of the shots hit a nearby nursing home.

had also been at the party but left when the police arrived, who were in the parking lot of the nursing home on Shepherd Lane, just at the end of Baron Drive, both saw the vehicle driving and stated that the vehicle was not trying to hit the officer. (DX 31, Seaton Interview; DX 17, Knight Interview). Even Oliver acknowledged that all five of the shots he fired at the vehicle were fired *after* the vehicle had passed by Officer Gross. (PX 10 at 205:23-206:9, Oliver Crim. Test.).

Oliver never reported hearing what he thought was gunfire from the car, and certainly never claimed he shot at the vehicle because he thought someone had shot at Officer Gross—until his summary judgment motion, where for the first time, Oliver seemed to attribute possible gunfire to the sound of what may have been glass breaking, caused by the impact of a flashlight on Gross's pistol on a partially-open back window in Vidal's car as it drove away. (PX 9 at 268:4-10, Tyler Gross Depo.). Balch Springs Chief of Police, Jonathan Haber and Officer Gross both testified that Oliver never said he shot because he thought he heard someone fire a gun. (PX 13 at 12:2-22, Haber Depo.; PX 9 at 272:14-24, Tyler Gross Depo.). Rather, at his criminal trial, Oliver testified only that he thought the vehicle was going to clip Gross. (PX 10 at 142:23-143:1, Oliver Criminal Test.).

Fearing for their lives, Vidal continued to drive southbound on Shepherd Lane and turned westbound onto Bishop Drive to check on Jordan. (PX 18 at ¶ 7, Vidal Allen Aff.; PX 19 at ¶ 7, Kevon Edwards Aff.). Vidal stopped his vehicle and called his father, Odell, and told him that Jordan had been shot and they needed help. (PX 18 at ¶ 7, Vidal Allen Aff.; PX 19 at ¶ 7, Kevon Edwards Aff.). While Vidal was receiving instructions from his father as to what to do, a Balch Springs patrol car with its sirens activated passed

them by.  (PX 18 at ¶ 7, Vidal Allen Aff.; PX 19 at ¶ 7, Kevon Edwards Aff.).  A short time later, Balch Springs Police Officer Jeremy Chamblee arrived and ordered Vidal, Kevon, and the Everett Twins out of the vehicle as the boys pleaded with Officer Chamblee to provide medical assistance to Jordan.  (PX 18 at ¶ 7, Vidal Allen Aff.; PX 19 at ¶ 7, Kevon Edwards Aff.).

Vidal attempted to exit his vehicle by opening the driver side door to alert the officers of Jordan's condition, but the officers immediately instructed him not to get out of the vehicle.  (PX 18 at ¶ 8, Vidal Allen Aff.; PX 19 at ¶ 8, Kevon Edwards Aff.).  An officer shouted for Vidal to roll down the window and he fully complied.  (PX 18 at ¶ 8, Vidal Allen Aff.).  Vidal received a command to drop his phone out of the window and to open the door.  (Id.).  Vidal was instructed to step out of the car one leg at a time and face forward away from the officers.  (Id.).  Vidal was then instructed to walk backwards toward the officers, who all had their guns pointed at Vidal.  (Id.).

Vidal complied with the officers' commands and then was handcuffed and placed into the back of a patrol vehicle where he would be detained for over two hours.  (PX 18 at ¶ 8, Vidal Allen Aff.).  The officers shouted similar orders to the other passengers and pointed their guns at Kevon and the Everett Twins as they exited the vehicle.  (PX 18 at ¶ 8, Vidal Allen Aff.; PX 19 at ¶ 8, Kevon Edwards Aff.).  Vidal, Kevon, and the Everett Twins were in extreme fear as they walked towards the police vehicles.  (PX 18 at ¶ 8, Vidal Allen Aff.; PX 19 at ¶ 8, Kevon Edwards Aff.).

At one point, Oliver reached the vehicle and began yelling at Vidal, Kevon, and the Everett Twins, even though they were all already fully complying with the other

officers' orders.  (PX 18 at ¶ 10, Vidal Allen Aff.; PX 19 at ¶ 9, Kevon Edwards Aff.). Oliver also reached inside the vehicle to check on Jordan.  (PX 18 at ¶ 10, Vidal Allen Aff.).

After everyone had exited the vehicle, medics were dispatched and arrived approximately 15 minutes later to attend to Jordan.  (PX 18 at ¶ 11, Vidal Allen Aff.; PX 19 at ¶ 10, Kevon Edwards Aff.).  Jordan was placed inside a waiting ambulance where he was attended to by two EMTs after sitting in the vehicle unattended for over twenty minutes.  (PX 18 at ¶ 11, Vidal Allen Aff.; PX 19 at ¶ 10, Kevon Edwards Aff.).  Vidal, Kevon, and the Everett Twins were all placed under arrest.  (PX 18 at ¶ 12, Vidal Allen Aff.; PX 19 at ¶ 11, Kevon Edwards Aff.).

In August 2018, Oliver was tried for the murder of Jordan Edwards.  At trial, Oliver did not seriously contest the fact that he shot and killed Jordan.  Rather, Oliver took the position that his shooting was justified because he was trying to protect a third person, Officer Gross.[6]  (PX 15, Criminal Jury Verdict).  Consistent with that theory, the jury was instructed—among other things—regarding this theory:

> A person is justified in using force or deadly force against another to protect a third person if:
>
> (1)  under the circumstances as the person reasonably believes them to be, the person would be justified in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2)  the person reasonably believes that his intervention is immediately necessary to protect the third person.

---

[6] Oliver never claimed in his criminal trial that he fired his rifle because he believed a gun was had been fired at them.

(PX 15 at 7, Criminal Jury Verdict). "Reasonable belief" was defined for the jury as "a belief that would be held by an ordinary and prudent person in the same circumstances as [Oliver]." (PX 15 at 6, Criminal Jury Verdict). Oliver's theory required that the State "prove beyond a reasonable doubt that [Oliver] did not act in defense of a third person as herein defined." (*Id.*). The State did, and on August 28, 2018, the jury returned its verdict, finding Oliver guilty of murder and, necessarily, rejecting Oliver's claim that his use of deadly force was justified. (PX 15 at 14, Criminal Jury Verdict). Judgment was subsequent entered on that verdict. (PX 16, Criminal Judgment).

Oliver appealed that judgment to the Dallas Court of Appeals, and on August 10, 2020, the Dallas Court of Appeals rejected that appeal and affirmed the judgment. (PX 17, Opinion); *see also Oliver v. State*, No. 05-18-01057-CR, 2020 WL 4581644 (Tex. App.—Dallas Aug. 10, 2020, pet. granted) (mem. op.). The court of appeals noted that Oliver "has not challenged the sufficiency of the evidence that he committed murder." (PX 17 at 16, Opinion). Rather, among other grounds, Oliver took the position that his conduct was "justified by his effort to defend Officer Gross from being hit by the Impala." (*Id.*). Accordingly, Oliver challenged the sufficiency of the evidence to support the jury's rejection of that theory. (PX 17 at 16-21, Opinion). Reviewing both the eyewitness and expert testimony, much of which was also made a part of the summary judgment record, the Dallas Court of Appeals rejected Oliver's challenge, concluding:

> A rational jury could have determined that the Impala's path down Shepherd Lane could not give rise to a reasonable belief that Allen was threatening Officer Gross with unlawful deadly force. And a rational jury could, therefore, have concluded that it was not immediately necessary for appellant to employ deadly force against Allen in an effort to stop the

Impala. We conclude that the evidence is legally sufficient to support the jury's rejection of [Oliver's] justification of defense of third person.

(PX 17 at 20, Opinion).

On October 13, 2020, Oliver filed a Petition for Discretionary Review with the Texas Court of Criminal Appeals. That petition was initially granted but, on June 22, 2022, the Court of Criminal Appeals dismissed it as improvidently granted. *Oliver v. State*, No. PD-0845-20, 2022 WL 2240200 (Tex. Crim. App. June 22, 2022). Thus, Oliver's criminal conviction is now final.

Plaintiff contends that Roy Oliver used excessive, deadly force in violation of Jordan Edwards's Fourth Amendment rights. Specifically, Roy Oliver used excessive and unnecessary deadly force under the circumstances that was the cause of Jordan Edwards's death. Plaintiff further contend that Roy Oliver's conduct was not objectively reasonable under the circumstances because there was no immediate threat of serious physical injury to Roy Oliver, Officer Gross, or anyone else on the scene. Plaintiff contends that Roy Oliver is not entitled to qualified immunity for his conduct. Plaintiff also contends that Roy Oliver's conduct was motivated by malicious or evil intent or demonstrated reckless or callous indifference to Jordan Edwards's constitutional rights.

The Estate of Jordan Edwards is entitled to recover damages for Jordan's conscious physical pain and mental anguish, as well as the funeral and burial expenses. The Estate is also entitled to punitive damages.

Jordan's biological father, Odell Edwards, is a statutory wrongful death beneficiary entitled to recover the damages he has suffered for past and future pecuniary

loss, loss of companionship and society, and mental anguish.  Plaintiff is also entitled to

entitled to the recovery of statutory attorney's fees pursuant to 42 U.S.C. § 1983.

In addition to these damages, Plaintiff should also be awarded interest thereon in

the form of both prejudgment and post-judgment interest, taxable court costs, and such

other and further relief, in law or in equity, both general and special, to which they may

be entitled.

**B.      Defendant Officer Roy Oliver ("Officer Oliver")**

1.      This is an excessive use of force case brought by Plaintiffs, Odell Edwards

Individually and as Representative of the Estate of the Deceased, Jordan Edwards

("Deceased"), (collectively referred to as "Plaintiffs").  On April 29, 2017, the Deceased,

then a minor, was involved in a fatality shooting incident in the City of Balch Springs,

Texas ("Balch Springs").  Plaintiffs sue Officer Roy D. Oliver ("Officer Oliver"), a former

police officer for Balch Springs.  They allege violations of 42 U.S.C. § 1983 and the Fourth

Amendment to the United States Constitution (Excessive Force).

2.      Officer Oliver defends on the grounds that he did not violate the Fourth

Amendment/Excessive Force, that his conduct is excused by qualified immunity as well

as the good faith belief of the lawfulness of his conduct.  Plaintiffs are prohibited from

pursing state claims against Officer Oliver pursuant to § 101.106 of the Texas Civil

Practices and Remedies Code.  Plaintiffs and others caused/contributed to Plaintiffs'

damages. Odell Edwards is not the legally designated representative of Jordan Edwards

("Deceased").

## II.    Statement of Stipulated Facts

1.    Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under 42 U.S.C. § 1983.

2.    Venue is proper in this Court because the causes of action occurred within the Northern District of Texas, Dallas Division.

3.    Defendant Roy Oliver was, at all relevant times, a licensed Texas police officer employed by the City of Balch Springs.

4.    Defendant Roy Oliver acted "under color" of the authority of the State of Texas.

5.    Defendant Roy Oliver was convicted of murder and sentenced to 15 years in prison for the death of Jordan Edwards and all appeals of that conviction are final.

## III.    List of Contested Issues of Fact

**A.    Plaintiff Odell Edwards, individually and on behalf of the Estate of Jordan Edwards.**

1.    Whether Jordan Edwards suffered an injury which resulted directly from Roy Oliver's use of force that was excessive to the need.

2.    Whether Jordan Edwards posed an immediate threat of serious physical harm to Roy Oliver or others at the time that Roy Oliver shot Jordan Edwards.

3.    Whether a reasonable police officer could have believed that the shooting and killing of Jordan Edwards was lawful in light of clearly established law and the information Roy Oliver possessed at the time he made the decision to shoot.

4.      Whether Roy Oliver's conduct was motivated by malicious or evil intent or demonstrated reckless or callous indifference to Jordan Edward's constitutional rights.

5.      Whether the Estate of Jordan Edwards suffered conscious physical pain and mental anguish and incurred funeral and burial expenses as a result of the shooting by Roy Oliver and, if so, the amount of those damages.

6.      Whether Jordan Edward's father, Odell Edwards, suffered past and future pecuniary loss, loss of companionship and society, and mental anguish as a result of the death of Jordan Edwards and, if so, the amount of those damages.

7.      Whether the Estate of Jordan Edwards is entitled to punitive damages against Roy Oliver and, if so, the amount of such damages.

8.      Whether Odell Edwards incurred reasonable and necessary attorneys' fees in the prosecution of this case pursuant to 42 U.S.C. § 1983 and, if so, the amount of those fees.

9.      Any contention above that has been improperly designated as a disputed issue of fact when it should be considered a disputed issue of law should be re-designated as such.

**B.      Defendant Officer Oliver**

1. Whether Office Oliver violated the Fourth Amendment by and through 42 U.S.C. § 1983.
2. Whether Plaintiffs suffered a violation of any right or law.
3. Whether Plaintiffs suffered a violation of any clearly established constitutional right and/or other law.
4. Whether Officer Oliver's use of force was objectively reasonable.

5. Whether Plaintiffs meet their excessive force burden of pleading and proof of (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force was objectively unreasonable.

6. Whether Plaintiffs meet their burden of pleading and proof to overcome Officer Oliver's qualified immunity.

7. Whether Plaintiffs' state law claims are prohibited by §101.106 of the Texas Civil Practices and Remedies Code.

8. Whether Odell Edwards is a legally designated representative of the Deceased's estate.

9. Whether Plaintiffs are entitled to recover actual and/or punitive damages, attorneys' fees, and other relief from Officer Oliver.

10. Whether Plaintiffs' and others' negligent/intentional acts or omissions contributed or caused the alleged injuries.

11. Whether Deceased and others were able to understand the deadly force threat/danger the suspicion/inclusion/omission of gang members presented to those inside/outside the House Party.

12. Whether Deceased and others were able to understand the threat/danger that drunk/disorderly minors ingesting alcohol and drugs presented to the community.

13. Whether Deceased and others were able to understand the officers use of a "slow roll" deescalating approach to the large/unruly House Party presented to those inside/outside the House Party.

14. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed by the many individuals that migrated to the gang confrontation in a coordinated fashion to observe/participate in the flexing/confrontation.

15. Whether Deceased and others were able to understand the deadly force threat/danger posed by the proximity of the Suspect Car/crowd to the Gang SUV/flexing/yelling about a murdered gang member.

16. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed by the many gun shots at/by/near the crowd, the officer, the occupants and/or the Suspect Car.

17. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed by the 40 caliber S&W and 9mm Luger involved in 3 felonies (including a murder) posed to the crowd, the officer, the occupants and/or the Suspect Car.

18. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed by the chaos, running/screaming individuals, as well as the individuals that identified the Suspect Car as being involved in the confrontation.

19. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed by officers reporting the shots fired alert and the call for back up.

20. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed by semi-compliant to non-compliant persons/vehicles rapidly departing the scene.

21. Whether Deceased and others were able to see and/or understand the armed commands given by the Primary Officer during the deadly force threat/danger.

22. Whether Deceased and others were able to see and/or understand the deadly force threat/danger the non-compliance to four armed commands posed to those inside/outside the Suspect Car.

23. Whether Deceased and others understood the deadly force threat/danger the Suspect Car backing away from the armed officers, backing through a stop sign, and narrowly avoiding northbound traffic posed to those inside/outside the Suspect Car.

24. Whether Deceased and others understood the deadly force threat/danger the Suspect Car moving toward/at/by/past the Officers posed to those inside/outside the Suspect Car.

25. Whether Deceased and others understood the deadly force threat/danger the Primary Officer posed with his sidearm aimed and ready to fire.

26. Whether Deceased and others understood the deadly force threat/danger the Secondary Officer posed with his department issued long rifle aimed and ready to fire.

27. Whether Deceased and others understood the deadly force threat/danger posed by the Primary Officer locking eyes with the Suspect Car driver.

28. Whether Deceased and others understood the deadly force threat/danger when the Deceased warned "Duck! Get Down!"

29. Whether Deceased and others understood the deadly force threat/danger posed by the furtive movements by the Deceased and occupants of the Suspect Car.

30. Whether Deceased and others understood the deadly force threat/danger the breaking glass/gunshot/violence sound as well as the lack of any muzzle flash from Primary Officer Gross' sidearm as the Suspect Car moving toward/at/by/past the Officers posed to those inside/outside the Suspect Car.

31. Whether Deceased and others understood the Suspect Car's total non-compliance, and the deadly force threat/danger it posed to those inside/outside the Suspect Car.

32. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed and the Officers' "active shooter" movements/parameters/goals presented to all those present.

33. Whether Deceased and others were able to see and/or understand the reaction time needed to respond to the deadly force threat/danger posed by the Suspect Car/Occupants and the sound of glass/gunshot/violence.

34. Whether Deceased and others were able to see and/or understand the deadly force threat/danger posed by Officer Oliver's undisputed first shot and Nursing Home bullet hole.

35. Whether Deceased and others were able to see and/or understand the lack of an asphalt mark/Gunshot Residue ("GSR") within the 6-8 foot area of the impossible

$5^{th}/6^{th}$ shot into the street by Oliver as presented by Plaintiffs/Dallas County District Attorney ("DCDA").

36. Whether Deceased and others were able to see and/or understand the unexplained/unrecorded movement of Officer Oliver's shot sequence and the lack of time to complete that movement between the 4th and 5th proposed shots as presented by Plaintiffs/DCDA.

37. Whether Deceased and others were able to see and/or understand the GSR found on the Deceased left hand and the physical/chemical impossibility to connect that with Officer Oliver as presented by Plaintiffs/DCDA.

38. Whether Deceased and others were able to see and/or understand the reaction time needed to respond to a deadly force threat/danger posed by the Suspect Car/Occupants.

39. Whether Deceased and others were able to see and/or understand the reaction time needed to respond to respond/aim/discharge Officer Oliver's department issued long-rifle at/into the Suspect Car.

40. Whether Deceased and others were able to see and/or understand the parameters of the department issued Federal Premium Law Enforcement Ammunition/Tactical Rifle Urban .223mm rounds used by BSPD/Oliver.

41. Whether Deceased and others were able to see and/or understand their contributory responsibility in the deadly force threat/danger and the reduction of Officer Oliver's liability/responsibility, if any.

## IV.   List of Contested Issues of Law

**A.   Plaintiff Odell Edwards, individually and on behalf of the Estate of Jordan Edwards.**

1.   Whether Roy Oliver's criminal murder conviction constitutes offensive collateral estoppel as to Plaintiff's excessive deadly force claim and Roy Oliver's qualified immunity defense and establishes, as a matter of law, in this civil proceeding that Roy

Oliver used excessive, deadly force in violation of Jordan Edward's constitutional rights and negates, as a matter of law, Roy Oliver's qualified immunity defense.

    2.    If, however, Roy Oliver's criminal conviction does not constitute collateral estoppel regarding all liability issues, then the contested issues of law will be:

    a.    Whether Roy Oliver used excessive, deadly force;

    b.    Whether Roy Oliver's use of deadly force was objectively reasonable under the circumstances;

    c.    Whether the clearly established law at the time prohibited the use of deadly force to prevent escape when that escape poses no immediate threat to the officer or to others; and

    d.    Whether Roy Oliver is entitled to qualified immunity.

**B.**    **Defendant Officer Oliver**

1. Whether Office Oliver violated the Fourth Amendment by and through 42 U.S.C. § 1983.
2. Whether Plaintiffs suffered a violation of any right or law.
3. Whether Plaintiffs suffered a violation of any clearly established constitutional right and/or other law.
4. Whether Officer Oliver's use of force was objectively reasonable.
5. Whether Plaintiffs meet their excessive force burden of pleading and proof of (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force was objectively unreasonable.
6. Whether Plaintiffs meet their burden of pleading and proof to overcome Officer Oliver's qualified immunity.

7. Whether Plaintiffs' state law claims are prohibited by §101.106 of the Texas Civil Practices and Remedies Code.

8. Whether Odell Edwards is a legally designated representative of the Deceased's estate.

9. Whether Plaintiffs are entitled to recover actual and/or punitive damages, attorneys' fees, and other relief from Officer Oliver.

10. Whether Plaintiffs' and others' negligent/intentional acts or omissions caused/contributed to the alleged injuries/damages.

11. Whether Roy Oliver's criminal murder conviction is admissible/controlling as a matter of law and/or offensive collateral estoppel.

## V.   Estimated Length of Trial

1. Following jury selection and after the panel has been sworn and heard opening statements, the parties believe that the length of the trial of this case will be: Plaintiff – 4-5 days.

Defendant – 5-7 days.

2. This case is set for a jury trial.

## VI.   Additional Matters that Might Aid in the Disposition of the Case

**A.   Plaintiff Odell Edwards, individually and on behalf of the Estate of Jordan Edwards.**

1. Resolution of the collateral estoppel effect of Roy Oliver's criminal conviction on the liability phase of this trial.

2. In addition to the Court's standard written questionnaire attached to the Court's Trial Scheduling Order (Doc. 494), Plaintiff intends to submit additional questions and will submit those in accordance with Paragraph 4(b)(ii) of the Scheduling

Order. To the extent this is not already the Court's intention, Plaintiff respectfully requests that the questionnaire be completed by each juror upon arrival at the courthouse, prior to voir dire and that, upon the collection and delivery to counsel of those questionnaires and prior to voir dire, that counsel be given at least thirty (30) minutes to review the questionnaires.

3.      Plaintiff anticipates that in addition to use of the Court's equipment, they will use laptops, overhead projectors, DVD players, easels, trial boards and speakers.

4.      Plaintiff wishes to have the issue of Plaintiff's attorneys' fees handled post-verdict.

5.      Resolution of Plaintiff's Motion in Limine.

6.      Resolution of Plaintiff's Objections to Defendant Oliver's Pretrial Disclosures.

7.      Resolution of Plaintiff's Objections to Defendant Oliver's Witness List.

8.      Resolution Plaintiff's Objections to Defendant Oliver's Exhibit List.

9.      Resolution of Plaintiff's Motion to Strike Defendant Oliver's designated expert, Freddie Komar.

**B.      Defendant Roy Oliver.**

1.      Resolution of the previously filed Daubert Motions on Plaintiffs' Experts Hayden and Peters.

2.      Resolution of the collateral estoppel issue on Officer Oliver's conviction. Respectfully, this was addressed earlier.

3.      In addition to the Court's standard written questionnaire attached to the

Court's Trial Scheduling Order (Doc. 494), Oliver Counsel intends to submit additional questions and will submit those in accordance with Paragraph 4(b)(ii) of the Scheduling Order. To the extent this is not already the Court's intention, Oliver Counsel respectfully requests that the questionnaire be completed by each juror upon arrival at the courthouse, prior to voir dire and that, upon the collection and delivery to counsel of those questionnaires and prior to voir dire, that counsel be given at least thirty (30) minutes to review the questionnaires.

    4.     Oliver Counsel anticipates that in addition to use of the Court's equipment, he will use laptops, overhead projectors, DVD players, easels, trial boards and speakers.

    5.     Oliver wishes to have the issue of Plaintiffs' attorneys' fees handled within the verdict.

    6.     Resolution of Oliver's Motion in Limine.

    7.     Resolution of Oliver's Objections to Plaintiffs' Pretrial Disclosures.

    8.     Resolution of Oliver's Objections to Plaintiffs' Witness List.

    9.     Resolution Oliver's Objections to Plaintiffs' Exhibit List.

Signed this __27__ day of ___March_____, 2023.

_____
BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE

Respectfully submitted,

By: _/s/ Daryl K. Washington_

**Daryl K. Washington**
State Bar No. 24013714
**Washington Law Firm, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214-880-4883
214-751-6685 - fax
dwashington@dwashlawfirm.com

**Jasmine F. Crockett**
State Bar No. 24055361
210 N. State Line Ave., Ste. 304
Texarkana, Arkansas 71854
(469) 708-7379
(877) 561-2989 (fax)
attorney@jasminecrockett.com

and

**Law Office of J. Gregory Marks**
**J. Gregory Marks**
Texas Bar No. 1299490
1012 Pienza Path
Keller, Texas 76248
Telephone/fax: (214) 427-4417
gmarks@jgmarkslaw.com

*Attorneys for Plaintiff*

By: _/s/_

**William W. Krueger, III**
State Bar No. 11740530
wkrueger@kruegerlaw.org
**The Law Offices of**
**William W. Krueger,**
**III, PC**
501 West Lookout
Richardson, Texas 75080
(214) 253-2600
(214) 253-2626 (fax)

*Attorney for Defendant,*
*Roy Oliver*

## Certificate of Service

I hereby certify that on **February 16, 2023**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

| | |
|---|---|
| William W. Krueger III | Joe C Tooley |
| wkreuger@kreugerlaw.org | joe@tooleylaw.com |
| Law Offices of William W. Krueger, III PC | Law Office of Joe C Tooley |
| 501 West Lookout | 510 Turtle Cove, Suite 112 |
| Richardson, Texas 75080 | Rockwall, Texas 75087 |
| *Attorneys for Defendant, Roy Oliver* | *Attorney of Defendant, City of Balch Springs* |

*/s/ Daryl K. Washington*
**Daryl K. Washington**